STATE EX REL. CITY OF ST. LOUIS, a Municipal Corporation, Appellant, v. PUBLIC SERVICE COMMISSION OF MISSOURI, THE LACLEDE GAS LIGHT COMPANY, a Corporation, ET AL.—47 S. W. (2d) 102.

Court en Banc, February 17, 1932.

920

*Julius T. Muench* and *Forrest G. Ferris, Jr.*, for appellant.

*Fordyce, Holliday & White, Bennett C. Clark* and *Taylor, Chasnoff & Willson* for respondent.

924

D. D. McDonald and J. P. Painter for respondent Public Service Commission.

WHITE, J.—Appeal is from a judgment of the Circuit Court of Cole County, January 3, 1930, affirming the report of the respondent Commission January 15, 1929, in the case entitled: "In the Matter of the Application of Laclede Gas Light Company for permission to file new rates for gas service to its consumers at St. Louis, Missouri."

The Laclede Gas Light Company, a Missouri corporation, was engaged in furnishing artificial gas in St. Louis. April 25, 1927, it filed with the Commission a schedule of rates which modified and in some instances increased the rates then in force to consumers.

On May 7, 1927, the city of St. Louis filed a motion asking leave to intervene and the motion was sustained. The Commission then issued an order suspending the rates pending the hearing and ordered its accountants to make an audit. This suspension was renewed from time to time. Finally the proposed schedule was withdrawn and a new schedule filed. January 15, 1929, the Commission issued its order authorizing certain increase in rates and directed the filing of a rate schedule in conformity with the order, with which order the Company complied. The City then sued out a writ of *certiorari* to the circuit court.

The propriety of the new rates was contested mainly upon the valuation of the Company's property—the Gas Department—which the Commission for rate making purposes found to be as follows:

| | | |
|---|---:|---:|
| "Fair Value as of Oct. 1, 1925 | | $45,600,000 |
| "Additions and betterments to Dec. 31, 1927 | | 2,922,881 |
| "Total | | $48,522,881 |
| "Deductions: | | |
| "Reduced value of cast iron mains | $  560,000 | |
| "Unused property | 945,000 | 1,505,000 |
| "Net total as of Dec. 31, 1927 | | $47,017,881" |

The appellant City claims the present value should be found as follows:

| | | |
|---|---:|---:|
| "Commission's fair value as of Oct. 1, 1925 | | $45,600,000 |
| "Additions and betterments, Oct. 1, 1925 to Dec. 31, 1927 | | 2,919,625 |
| "Total | | $48,519,625 |
| "Deduct: | | |
| "Property not in use | $1,485,840 | |
| "Decrease in value of mains | 2,974,928 | |
| "Decrease in going value | 3,906,000 | |
| | | "8,366,768 |
| "Fair value as of Dec. 31, 1927 | | $40,152,857" |

Those figures march with us as we proceed through the mass of evidence. The estimate of the Commission and that of the City start with the Fair Value as of October 1, 1925, $45,600,000. This arises from a report made November 20, 1926; by the Public Service Commission in what is called the "Valuation Case." That valuation was based in part upon appraisal as of date December 31, 1923. The

Company had other properties, not under consideration here, valued at the time. This proceeding relates only to the Gas Department of the Company.

The differences between the City and the Company involve not only the deductions from the former valuation, but also the theory of determining deductions, depreciations and the like. The City also claims the rate of return allowed was too large and that the schedule of consumers' rates are discriminatory.

I. BURDEN OF PROOF. The City starts out with the assertion that the burden of proof is upon the Company to show that its proposed rate is just and reasonable, citing Section 5191, Revised Statutes 1929. That section applies to a hearing before the Commission. In all trials and proceedings growing out of the exercise of the powers of the Commission before the courts the rates and schedules ordered by the Commission are *prima facie* lawful and reasonable and the burden of proof is upon the party seeking to set aside "any determination, requirement, direction or order of the Commission." [Secs. 5246, 5247, R. S. 1929.] The order of the Commission fixing the value of the Company's property, the rate which it is allowed to earn on that property and the rates to consumers are *prima facie* reasonable and lawful, and the burden was upon the City to convince the trial court that the determinations, orders, etc., of the Commission were "unreasonable or unlawful."

Appellant in its reply brief admits that but claims it has sustained the burden by pointing out how the Company failed to sustain its case before the Commission.

II. COMMISSION'S FINDINGS: Besides a review of the order in this case we must consider the order made in the Valuation Case because the findings here are to some extent based upon it and the validity of some of the findings there.

Under Section 5234, Revised Statutes 1929, the circuit court may affirm or set aside an order of the Commission *under review,* and in its discretion may remand the case for further action; may direct the reception of evidence improperly excluded by the Commission. Outside of those provisions the circuit court has no authority to interfere with the orders of the Commission when reasonable, lawful and supported by the facts found by the Commission upon competent evidence. [State ex rel. Henson v. Brown, 31 S. W. (2d) 208, l. c. 210.] We cannot reverse an order of the Commission for receiving incompetent evidence, unless its order and decision is based upon such evidence, though we did in State ex rel. Water Co. v. Public Service Commission, 298 Mo. 524, by a divided court, review and *weigh* the evidence. We see no reason why we should do

that since we cannot make a finding of facts though we can determine whether the finding of the facts by the Commission is supported by competent substantial evidence. [State ex rel. v. Brown, 31 S. W. (2d) l. c. 210.]

In determining the reasonableness or unreasonableness of such an order a wide territory is opened for exploration. No specific limits have been defined beyond which a reasonable official act may not go, though various expressions are used in explanation, each depending upon the facts of the case where the question arises. [52 C. J. 1181; 43 C. J. pp. 304-308.] In general the reasonableness of an order of the Public Service Commission may be determined by the measurement applied by the courts to city ordinances. Such an order without being technically in violation of law would be unreasonable if oppressive, if discriminatory in rates, or if it allowed unwarranted valuations or rate of return. All of these objections are urged by the City to the determination of the Commission involved here.

As applied to orders in the Valuation Case: (Sec. 5199, R. S. 1929), the Commission is required to file and certify its findings of fact "which shall be admissible in evidence in *any* action, proceeding or hearing before the commission or any court . . . and such findings, when so introduced, shall be conclusive evidence of the facts therein stated as of the date therein stated under the conditions then existing, and such facts can only be controverted by showing a subsequent change in conditions bearing upon the facts therein determined."

That provision relates only to findings of *facts* upon the evidence before the Commission. In order to make conclusive the orders and decisions based upon such facts so found Section 5238, Revised Statutes 1929, provides:

"In all collateral actions or proceedings the orders and decisions of the commission which have become final shall be conclusive."

If the Legislature, by "collateral actions or proceedings," meant something different from "any action, proceeding or hearing," mentioned in Section 5199 the text does not show it. This is an independent proceeding and therefore collateral to the proceeding in the valuation case. In State ex rel. Saint Joseph v. Pub. Serv. Comm., 30 S. W. (2d) l. c. 10, we held that in making a *revaluation* of the property of a public service company the Commission could do so "unincumbered by the former valuation," if in the former valuation the Commission "used a wrong method" or "reached a wrong conclusion."

The inquiry into the propriety of the former valuation here is mainly directed to such changes as are contemplated by Section 5199. Sections 5199 and 5238 must be construed together and harmonized.

The "orders and decisions" mentioned in Sections 5238 are necessarily based upon the "findings of fact" required by Section 5199 to be filed. They are conclusive as authorized by those facts as of the date they were made. Such orders and decisions could not be conclusive as of a later date under a different state of facts. The findings of fact by the Commission in the Valuation Case were conclusive upon it in this case and are conclusive upon this court unless the evidence shows the conditions mentioned in Section 5199 have changed in such way as to compel a different finding, or unless the record shows such former findings were unreasonable or had no substantial basis in the facts then found.

III. REPRODUCTION COST OF MAINS. The Commission started with the "Fair Value" as of October 1, 1925, $45,600,000 found in the Valuation Case. The most important change in the physical property aside from property not used at the time of the present hearing was the cast iron pipe mains which were revalued at this hearing by the method of reproduction cost. The Company's Comptroller estimated the value of the mains at about 20% of the total property. It is the claim of the City that those mains had decreased in value since the former valuation $2,974,928. The Commission placed that decrease in value at $560,000.

The Commission in its report refers to the City's Exhibit 17, which shows the manner in which the City's engineer, Mr. Foley, arrived at the decrease in value claimed.

Reproduction cost of C. I. Mains exclusive of overhead as found by Commission's engineers' appraisal as of December 31, 1923 _____$11,988,591

Reproduction Costs exclusive of overheads, at present prices _____ 8,754,974

A difference of _____$ 3,233,617

Applying the same deduction for property not in use as was applied to the value of the whole property would leave 92% of _____$ 3,233,617

or _____ 2,974,928

As the estimated reduction in the value due to the reduced pipe installation costs since 1923.

Numerous items enter into the present cost of gas iron pipe and the expense of placing it, all of which are more or less disputed The Commission made this observation of appellant's claim:

"City's exhibit No. 17 shows its engineers have used $39.10 per ton as the average *present cost* of 6-inch and larger class 'B' gas pipe f. o. b. St. Louis and $60.04 as the average 1923 cost of the same

class of pipe. Both estimates are the quotations as given in 'Engineering News-Record' magazine.''

The Commission fixed the value of the cast iron pipe at $47 per ton,—$8 per ton more than the City's estimate. Calling attention to the fluctuations in such pipe as shown by the Engineering News-Record, the Commission pointed out that the price per ton January 1, 1928 was $36.10; that the average quotation for the year 1927 f. o. b. St. Louis was $43.14 per ton, and reached this conclusion:

''While the cost of cast iron pipe has materially dropped since 1923 and in the opinion of this Commission such reductions should be considered, the Supreme Court of the United States has said we must endeavor to fix a value that holds for a reasonable period in the immediate future (John W. McCardle et al. v. Indianapolis Water Company, P. U. R. 1927A, 15.) . . .

''During the years 1925 and 1926 the cost of said pipe averaged approximately $49.10 per ton and the Commission is of the opinion that $47 per ton for said pipe is a proper cost to use in estimating a fair value of this Company's mains for rates in the immediate future.''

Items which entered into the cost of laying the iron pipe consisted of labor, direct and indirect, tools and material.

The City presents the cost of the 6″ iron pipe mains as follows:

| | |
|---|---|
| Pipe material _____$ | .547 |
| Labor _____ | .49 |
| Miscellaneous _____ | .31 |
| | |
| Total _____$ | 1.347 per lineal foot. |

The Company's figures show that the value in 1923 was $1.962 per lineal foot, and in 1928 the cost per lineal foot was as follows:

| | |
|---|---|
| Labor _____$ | .956 |
| Cast iron pipe per ft. _____ | .628 |
| | $ 1.584 |
| Miscellaneous _____ | .588 |
| | |
| The total _____$ | 2.172 |

Thus it will be seen that according to the City's figures the cost of the iron pipe was a little more than one-third of the cost of the pipe mains laid in the ground, and according to the figures presented by the Company the cost of the iron pipe was a little less than one-third of that total cost.

The Commission upon all the evidence as to the value of the iron pipe reached the conclusion that the value of the Company's Gas Department as of date October 1, 1925, should be reduced by the sum of $560,000 *"to cover reduced value of cast iron distribution*

*mains.''* The Company in its motion for rehearing vigorously objected to even that deduction.

The report does not say how much of that reduced value is attributed to the reduced cost per ton of the cast iron pipe and how much, if any, is attributable to the cost of laying the pipe. From the conflicting evidence the Commission reasonably could have found no material change in the cost of laying the mains from 1923 to 1927, and could have placed the whole reduced value on the reduced cost of the pipe. If so, then the Commission took the reproduction cost in December, 1923, $11,988,591, approximately one-third of which was the pipe, and reduced it $560,000.

The hearing continued into 1928 when the value was continually rising and the Commission stated it was endeavoring to fix a value that would hold for a reasonable period in the immediate future. Rulings by the United States Supreme Court authorize the consideration of that factor in determining values.

In McCardle v. Indianapolis Water Co., 272 U. S. 400, that court said l. c. 409: ''The value is being fixed not for today, but for a reasonable period in the future.''

In State ex rel. Southwestern Telephone Co. v. Public Service Commission, 262 U. S. 276, l. c. 288, that court said:

''An honest and intelligent forecast of probable future values made upon a view of all the relevant circumstances, is essential.''

The Commission in placing the cost of cast iron pipe at $47 a ton when the price at the time was less, probably had before them all the evidence available for the purpose of making the forecast. The forecast was not justified by the result, but that does not invalidate the conclusion. The Commissioners in their position had had large experience in dealing with such matters as the fluctuations in price of material that enters into the property of public utilities, but they might be mistaken.

We need not consider whether the finding of reproduction cost was justified by the evidence for the method employed for comparison of reproduction cost with the findings in the Valuation Case was wrong and might produce a wrong result.

The reproduction cost was limited to the iron pipe mains, *new*, and the deduction from the former ''fair value'' was solely on account of lower cost of pipe and the possible lower cost of laying it.

The estimate starts with $11,988,591 as the reproduction cost of the mains in December, 1923, instead of October 1, 1925,—the date of the former valuation when iron pipe was much lower in price. That is stated as the ''Commission's engineers' appraisal.'' It is not the finding of the Commission in the Valuation Case. [P. U. R. 1927B, pp. 1-43.] In the order made then there was no separate finding of the reproduction cost of the iron pipe mains. [Id. l. c. 14-16.]

Of course the Commission in this case could make its own finding of the reproduction cost in 1923.

During the progress of the trial in this case while E. L. White, Comptroller of the Gas Company, was testifying, the finding in the Valuation Case came up and the record shows the following colloquy:

"COMMISSIONER CALFEE: 'How do you do that, Mr. White, the Commission made a lump sum finding, as you are aware.'

"THE WITNESS: 'Yes.'

"COMMISSIONER CALFEE: 'It was a finding in excess of original cost.'

"THE WITNESS: 'Well, what we had to do we had to get a figure of some kind on the Commission's finding, so we had to take the ratio of the reproduction cost to the Commission's finding, we had the reproduction cost as found by the Commission's engineers, *we took the total of that reproduction cost and took the ratio of that to the Commission's finding, and we applied that ratio by items for each class of property, so when we would write it off we would have the proper figure at which to write it off*. That is the only way we had of getting it. We may not be exactly accurate, but that is the closest thing we can get. *The Commission did not tell us what they found for each item of property*.'

"COMMISSIONER CALFEE: 'We made a lump sum finding, didn't we?'

"WITNESS: 'Evidently'."

Commissioner Calfee was on the Commission at the hearing in the Valuation Case and, we may assume, spoke for the Commission here in its understanding of the finding then. Recurring to the report and order in the Valuation Case:

After finding the reproduction cost and depreciation the Commission considered "Intangible Elements of Value," on the original cost basis and on reproduction cost basis, such as cost of financing, stock and bonds, commission to broker, the methods of accounts, etc., quoting from many cases in U. S. Reports regarding such items in valuing utility properties.

The report then devotes more than five pages to "Present Fair Value," stating that original cost, reproduction costs, financing cost, also "Increase in Values," "Accrued Depreciation," "Current costs" must be considered and concludes that "capitalization" is not a factor and concludes with this:

"The foregoing testimony we believe, shows the fallacy of attempting to fix present fair value *on the reproduction cost basis,* without giving any consideration to other factors." (Italics ours.)

Then follows the final summary:

"In view of the foregoing and after careful examination and consideration of all the evidence herein, we find the present fair value of the property of the Laclede Gas Light Company, *including all elements of value, tangible and intangible,* as of October 1, 1925, to be as follows:

"Gas Department _____$45,600,000"

These figures appear in the summary and are reproduced by the Commission in this case:

"Original cost of Physical Property, except land ____$28,500,000
"Reproduction Cost of Physical property, except land  45,400,000
"Accrued Depreciation _____   5,000,000

"Leaving a net Reproduction Cost of Such Property,
    less accrued depreciation _____$40,400,000
"Add Market Value of Land _____   2,687,131
"Going Value _____   5,818,000

    'Total of the three items _____$48,905,131"

It should be noted here that actual reproduction cost of physical properties except land was estimated at about $35,000,000. The balance of the $45,400,000 was made up of three items: working capital $2,600,000; additions and betterments $2,329,838, and "Omissions, contingencies and overhead costs" estimated by engineers at $5,808,469 to $5,962,500. [P. U. R. 1927B, l. c. 16.] The original cost had similar items in its content.

The Commission found the fair value as of October 1, 1925, based on appraisals of December 1, 1923, to be (l. c. 43) $45,600,000.

Let us see what that means:

Adding the separate values:
    Reproduction  Cost _____$45,400,000
    Land  _____   2,687,131
    Going  Value _____   5,818,000

        Total  _____$53,905,131
Subtract the Fair Value found _____  45,000,000

                                                   $ 8,305,131

That sum includes the $5,000,000 for depreciation and $3,305,131 additional deduction in ascertainment of the "fair value" by considering elements other than depreciation.

Thus the "fair value" arrived at in the Valuation Case was not the reproduction cost but more than $8,000,000 *less* than the reproduction cost of the physical properties, with the value of the land and going values added. The fair value was about equal to the reproduction cost

of the physical personal properties alone, without counting the land and going value. This, a witness for the Company said, was a mere coincidence. The Commission in the passage quoted above justified its conclusion because of the fallacy of attempting to fix present fair value on reproduction cost.

Yet the Commission in this case took the reproduction cost (estimated by its engineers as of 1923), and sealed it down by the reproduction cost *new* at the time of the hearing. It thus adopted a standard of valuation as of the former date, repudiated by the Commission *then,* for comparison with present values.

The present reproduction cost could not be compared with the *former fair value.* No separate fair value of iron pipe mains was found in the Valuation Case. The Commission here might have estimated the fair value as easily as they found the reproduction cost then and might have compared it with the fair value now, taking into consideration the steady obsolescence of the company's property. The Commission could of course properly consider reproduction cost then and now as an aid in the determination, but the error was in making reproduction cost the sole measure of values for that purpose when they had adopted the fair value method of the Valuation Case. As it was they took the difference between the reproduction cost in 1923 and reproduction cost in 1927, and subtracted that difference from the "fair value" found in the former case, with no allowance for depreciation during that interval.

This brings us to a consideration of reproduction cost as a rate base.

In State ex rel. Southwestern Bell Tel. Co. v. Public Service Commission, 262 U. S. 276-312, Justice BRANDEIS in a dissenting opinion in which Justice HOLMES concurred, went into the history of ascertaining values of public utilities for rate making purposes until the present "fair value" rule was obtained. Reproduction cost was resorted to as a "protest against burdens believed to have resulted from watered stock, reckless financing, and unconscionable construction contracts." (1. c. 298.)

It was offered "largely as a means, either of supplying lacks in the proof of actual cost and investment, or of testing the credibility of evidence adduced or of showing that the cost of installation had been wasteful. For these purposes evidence of cost of reproduction is obviously appropriate."

Later reproduction cost was found by commissions to be inadequate. "Gradually it came to be realized that the definiteness of the engineer's calculations was delusive; that they rested upon shifting theories; and that their estimates varied so widely as to intensify, rather than allay doubts." (1. c. 299.)

While this was said in a dissenting opinion it was fortified by authorities and is no doubt a true account of the evolution of present methods of valuation of rate bases. All this progress was largely due to examination of the facts by Commissions who found, as did the Commission in the Valuation Case, "the fallacy of attempting to fix present fair value on reproduction cost basis," citing several cases from the United States Supreme Court, including Standard Oil Company v. So. Pac. Co., 268 U. S. 146. [See Georgia Railway Co. v. R. R. Comm., 262 U. S. 1. c. 630-631.]

If reproduction cost alone is resorted to as rate base it does not allow for differences of opinion. If there is conflicting evidence as to the value of the different items which entered into the reproduction cost, when the Commission found the *facts* it settled the value of each item and the total reproduction cost. It was then no longer a matter of opinion or of estimate. That cost was fixed. It is not the same thing as market value, value in use, investment value, about which opinions may differ, leaving room for a conclusion different from actual figures. If it is resorted to as the sole element of value it becomes a fixed amount. There is no rule by which it may be increased or diminished, without taking cognizance of other elements of value.

The reproduction cost was of mains apparently installed long ago, probably before the Public Service Commission law was enacted, mainly for the purpose of lighting streets and houses, and for that reason little adapted to present purposes. Mr. White, the Comptroller for the Company testified:

"In 1927 we abandoned $110,000 of mains and services and $145,000 of street lamps. . . .

"I estimate the retirements for 1928 at $700,000. . . .

"We actually charged off $7500 for street mains in these three months."

"The street mains to be removed, with the exception of those widenings which will be completed this year, estimated at $50,000."

The Company estimated that the property to be retired during 1928 and 1929 was worth $1,450,000. How much of this was mains is not shown. The witness explained that some mains became inadequate because of increased population and increased demand and were replaced by larger mains. Those replacements possibly entered into the list of additions and betterments.

Those abandoned mains were valued for the purpose of comparison at *reproduction cost new.* Their "fair value" was exactly zero. Those to be retired in 1928 and 1929 were hardly worth more.

No doubt it would be easy to show how much of those abandoned and obsolescent mains, as valued in 1925, entered into the estimates mentioned. The difference between their fair value and the fair value

estimated in 1925 should have been deducted from the former valuation.

IV. ACCRUED DEPRECIATION. The physical personal properties other than mains, about 80% of the whole, were allowed to stand at the fair value fixed in the Valuation case as of October 1, 1925, with no allowance for accrued depreciation up to the present finding. That the property did depreciate during that period is amply shown.

While no account was taken of "accrued depreciation" the evidence was abundant as to annual "accruing depreciation." The former is deducted from the value of the Company's property as a rate base; the latter is estimated and the Company allowed to make it up out of the earnings, as a depreciation reserve, at the expense of the consumers. Hence it is to the interest of the Company to have the former low and the latter high.

The Commission in the Valuation Case said: (P. U. R. 1927B, l. c. 19):

"Depreciation cannot be wholly overcome by repairs. In spite of all the repairs that would be economically justifiable, there would still be accrued depreciation in the property."

The Commission after citing authorities to support that conclusion, which was a matter of fact for the Commission to decide, added:

"It is accrued depreciation and not deferred maintenance which must be deducted from reproduction cost new."

It must be remembered that when the values were determined, 1923-1925, prices were at their peak. The cost of iron pipe was almost double what it afterwards became and much higher than it had been before. All other material used by the Company was also high. The original cost, probably extending over years of the Company's extension of service and expansion of equipment, $27,500,000 was only about 58 per cent of the reproduction cost, $45,400,000, in 1923-1925. People had adjusted themselves to the high cost of living complained of so vigorously just after the war and had become convinced that the boom was to last indefinitely. That state of mind with the abnormally high reproduction cost no doubt affected the Commission in fixing the "fair value."

The shrinkage of values reported in the Valuation Case was recognized by the Commission in its adjustment of the value of iron pipe mains by the reproduction cost method, in which treatment the Company seemed to agree. But no account was taken by the Commission of such shrinkage in value of the other property, nor mentioned by any party to this proceeding.

The accruing depreciation by ordinary wear and tear is cared for by a depreciation reserve deducted from the earnings,—a matter more fully considered under the next point. In the Valuation Case the Commission allowed the Company to retain an additional one per cent per annum "cost" of the property for that purpose. We are controlled by the rulings of the federal courts as to how and when accrued depreciation may be accounted for. Some cases quoted from conclusions of Commissions. It was said in the case of Bluefield Telephone Co. v. Public Service Commission, 102 W. Va. l. c. 303:

"A depreciation rate which accumulates and retains a surplus 'beyond the reasonable requirements of the company,' should not be foisted upon the patrons of a utility."

It said further in the same case that the "depreciation reserve should at all times approximately equal the difference between the cost of the physical property and its present depreciated value."

But it was said by the Supreme Court in Galveston Electric Co. v. Galveston, 258 U. S. 398:

"The proper, annual charge for maintenance is the amount normally required for that purpose during the period; it is not necessarily the amount actually expended within the year."

And further, l. c. 399:

"The company asked to have allowed as a further charge $29,500 a year on account of what is called deferred maintenance. . . .

"This is an attempt, in another form, to capitalize alleged past losses; and the request was properly refused both by the master and the court."

It seems that the depreciation reserve should be sufficient, not only for maintenance and repairs, but also to equal the necessary depreciation by wear and not overcome by repairs or replacements.

It may have been understood that whatever that depreciation was was offset by the reserve fund which would keep the Company at its level of values. We are not prepared to say that the matter could not be properly disposed of in that way. Yet, if that ordinary depreciation is to be overcome by sufficient reserve to balance the values, account would have to be taken of natural fluctuations in values which have nothing to do with the efficiency of the property. Nor should a reserve fund be allowed to pile up beyond the necessary requirements for efficient management.

This brings us to the two kinds of accrued depreciation shown in this case.

Besides the wear and tear of the property from use the ordinary accrued depreciation, there was accrued depreciation from total abandonment.

The witnesses speak of "retirement." There was an "extra heavy retirement of street lamps" in December, 1925, after the date of the former valuation.

The Company's Comptroller, Mr. E. L. White, testified that $145,000 of street lamps were abandoned in 1927. "Next year there will be $380,000 street lamps retiring. About $250,000 will be charged off this year for this item." Besides, there was an estimated retirement for the years 1928-9 amounting to $1,450,000.

"The retirement of street lamps is not a recurring item, not a permanent replacement; but next year something else will go out."

Those items are "charged off." He explained further:

"As an example of obsolescence we are taking out of use in the city all the street lights in the City of St. Louis. At the time the Commission in this case made their appraisal and at the time of the *Valuation* (Case) *all of this property was used and useful*. It is just as good as new and we have to take it out . . . and write it off our property account."

This property so retired is no longer used, nor useful, nor property.

Its fair value allowed in the Valuation Case should have been determined and deducted in ascertaining present values.

We have taken account of this matter because it is inextricably associated with the depreciation reserve which was warmly contested, —the topic next to be considered.

V. DEPRECIATION RESERVE. All evidence in regard to accrued depreciation came out in the contest over the Company's claim for an allowance of depreciation reserve. The Company claimed that the annual depreciation was 3.2 per cent, and that that much should be allowed to accumulate from the earnings as a reserve to offset the depreciation. The Company's exhibits give estimated per cent of depreciation on its several properties for the year 1927. It includes everything—plant equipment, steam engines, trunk lines, gas service meters, municipal light fixtures, implements, etc. The Commission allowed 1.5 per cent, which we believe was supported by competent evidence. Commissioner Calfee, dissenting, agreed to that finding as did also Commissioner Porter in a qualified concurrence.

We are concerned here with the reserve fund accumulated. The Company began the reserve as far back as 1907. The totals in the fund at the end of each year are set out:

In 1925 it was _____$1,171,348.75
In 1926 it was _____ 1,309,230.69
In 1927 it was _____ 1,162,719.71
December 31, 1927 the fund amounted to _____$2,500,782.03

This was the sum remaining in the fund besides what had been used in repairs and replacements.

There is no showing as to how much of this is due to the 1 per cent allowed in the Valuation Case, but the amount for 1925, $1,171,-348.75 was increased to $2,500,782.03 December, 1927. Either that increase was obtained from the 1 per cent, or the Company reserved more than the order in the Valuation Case permitted.

Commissioner Calfee in his dissenting report comments on the evidence:

"In the valuation case the company offered much evidence tending to show that there was very little accrued depreciation in its property, that its various units of property were well maintained and long lived . . . and that taking their property as a whole, there was a very small rate of depreciation from year to year. The effect of this testimony was, of course, to show a very high per cent condition and to greatly lessen the amount of accrued depreciation, thereby securing for the company the highest possible valuation of its property. It is true that the Commission did not adopt the theories of depreciation urged by witnesses for the company, but it is also true that the *Commission considered this evidence and gave it material weight in arriving at the amount of accrued depreciation in the property in the valuation case.*

"In the present case it seems clear to me that the company is proceeding upon a different theory . . . It now offers evidence tending to show that *the lives of its various units of property are not so long, that there is a considerable degree of depreciation accruing in its property from year to year,* and some of its testimony in this case might be taken to indicate an approaching obsolescence, in the near future, of a considerable part of its property. All this evidence was, of course, offered by the company for the purpose of showing that it should have an increased annual depreciation allowance."

His conclusions are supported by the record. The Company attempted to show small *accrued* depreciation when valuing its property for rate making purposes, and large *accruing* depreciation (annual) when it claimed a reserve out of its earnings to meet it, and thereby increase the rate to consumers, although there was nothing in the condition to show that depreciation was accruing more rapidly *after* the Valuation Case than *before.* Commissioner Calfee quoted the following apt passage:

" 'It seems entirely contrary to equity and sound reason that a different definition should be applied in the determination of the amount of accrued depreciation existing in a property and in the determination of the amount of depreciation currently accruing in the same property.' Whitten's Valuation of Public Service Corporations (Revised Edition by Wilcox), Vol. 2, Paragraph 858, Page 1872."

He then added:

"But in the light of evidence now offered by the Company itself, I am convinced that the finding of the Commission in the valuation case as to the value of the gas property should likewise be modified, that the *amount of accrued depreciation in the gas property should be increased, thereby diminishing the fair value of the property.*

"It seems clear to me that there is an obvious relation between, and interdependence of, accrued depreciation and the annual depreciation allowance."

This statement relates to accrued depreciation just considered, but it is pertinent here because the Company sought to include in the reserve sums sufficient to meet retirements as well as depreciation from ordinary wear and tear. We have mentioned above the abandoned mains and the Company's estimated retirements for 1928, $700,000, and for 1928-9, $1,450,000. This was property to be abandoned, not replaced.

The Commission on that claim made this comment:

"It is true that the present consumer should not be compelled to pay for the failure of the Company to protect its investment in the past, *and the Commission is of the opinion that a large amount of the property now being retired, was constructed prior to the organization of a depreciation reserve fund and on such items of property the Company will not be allowed to make a full deduction* from the fund. . . ."

Commissioner PORTER in a concurring opinion commented:

"The Company contends for a much higher return for depreciation and gives as an example of the need for same the City 'of St. Louis' recent change from gas to electricity for street lighting. This is not depreciation (for which a reserve may be allowed was evidently Porter's meaning). *This is one of the hazards of the game.*"

It is an economic truth that public utility appliances will wear out. By the Public Service Commission Statutes the State undertakes to protect utility companies against loss on that account by allowance of depreciation reserves, but when an appliance becomes obsolete by reason of scientific discoveries and inventions, it is a risk which investors in such utilities must take.

"A public utility is entitled to earn a reasonable sum for depreciation of its property, including necessary retirements, ordinary obsolescence and diminishing usefulness which cannot be arrested by repairs, *but not including extraordinary obsolescence, so called, or extensive supersessions of property or equipment,* nor including past depreciation." [51 C. J. 25; Pub. Utility Comm. v. United Ry., 155 Md. 572, 278 U. S. 567.] (Italics ours.)

The abandoned lights and mains come clearly within the designation of "extensive supersession," "extraordinary obsolescence."

In the Maryland case, l. c. 605, the court said:

In "the progress of science and the improvement of mechanical and electrical equipment, some parts of the company's property will from time to time become out of date, and unsuited to its present needs, and should be retired. . . . by extraordinary obsolescence we mean an extensive supersession of property used for transmission or the generation of power, or instrumentalities used for the transportation."

The abandonment of property which is never replaced but is superseded by another instrumentality, as gas lamps by electric lights or by another agency or company, is an extraordinary supersession. Its loss is "one of the hazards of the game," just as the extraordinary increase in values following the war was an unexpected gain allowed in the Valuation Case. [Pac. Tel. Co. v. Whitcomb, 12 Fed. (2d) l. c. 282.] It follows that the abandoned property, lights, service mains and the like should not be considered for the purpose of determining the annual depreciation reserve.

While the effect of the allowance far below the Company's claim was to hold that the abandoned property was one of the hazards of the game, the Commission should have deducted the value of such retirements from the fair value of the property, as we have held above. The Commission could not consistently hold that such retirements could not be "cared for" in the depreciation reserve and at the same time refuse to deduct their former value as accrued depreciation from the Company's property. They could not be at once the Company's loss and paid for by the consumers.

We have considered the matter at some length because in the majority report of the Commission some weight seems to have been given to the Company's claim, which we find untenable, though a reasonable result was reached. The question, no doubt, will come up on a rehearing and the claim advanced that the depreciation reserve should be sufficient to include the value of property totally abandoned. We think it proper to settle the question here.

VI. ADDITIONS AND BETTERMENTS. The Company valued its additions and betterments at $2,922,881, the City at $2,919,625. The difference is so slight that we may treat it as negligible; it could not affect the rates to consumers.

The City introduced Mr. Boyles who audited the Company's books and swore that the depreciation reserve fund existed only as a book account. He said that possibly it may have been used for additions and betterments and to replenish the working capital which was put at $2,600,000. The City did not pursue the inquiry so as to elicit

definite facts, and makes no point on it, so that we have no issue before us in regard to it.

VII. GOING VALUE. The City vigorously attacks the item Going Value which the Commission refused to change from the amount supposed to have been allowed, in the Valuation Case. In their report they mention it as $5,818,000, and say there was much theory but few if any real facts brought forth to authorize a change.

The City contends that $5,818,000 was excessive, and the Commission here erred in adopting it ''because it is impossible to determine from the Commission's previous finding the facts upon which the allowance was based.''

The Company claims the allowance in the former case could not have been $5,818,000, but if it was that amount it was not excessive. The figures taken from the report in that case, giving a summary of the findings, are stated above:

| | |
|---|---:|
| Reproduction Cost | $45,400,000 |
| Land | 2,687,131 |
| Going Value | 5,818,000 |
| Total | $53,905,131 |

From this was deducted $5,000,000 for depreciation and $3,305,131 additional in order to get the fair value, $45,600,000. We are confronted with a variety of explanations as to the items from which that $3,305,131 was deducted. The City says it was taken from the physical property, from which already $5,000,000 has been deducted as accrued depreciation, leaving $5,818,000 going value as first found intact. The Company claims the $3,305,131 could have been taken from the going value.

This court in the Water Company Case, 298 Mo. 524, quoted from Knoxville Water Company Case, 212 U. S. 1. c. 9, defining going value as follows:

''An expression of the added value of the plant as a whole over the sum of the value of its component parts, which is attached to it because it is in active and successful operation and earning a revenue.''

No definition of going value found in the books disagrees with that. When the Commission in the Valuation Case took the different items of value which included the land, the reproduction cost less depreciation of the other physical properties and working capital, whatever was added was the going value. Then when the Commission reduced the valuation $3,305,000, it might mean that the amount was taken from the going value, or from the total value.

If that lump sum deduction applied to each item of value in proportion to its amount, the going value was reduced in the same ratio as the other items. But the report here found that the item of going

value remained $5,818,000 after the reduction. The City agrees with that. Let us see what that means:

The reproduction cost fund in the Valuation Case was $45,400,000
Less accrued depreciation _____ 5,000,000

$40,400,000

Deduct Going Value _____$5,818,000
And working capital _____ 2,600,000    8,418,000

Leaving the physical personal property _____$31,982,000
The going value would equal more than 18 per cent of
    that property.
With the land _____ 2,687,131

The amount would be _____$34,669,131

The going value would be nearly 17 per cent of the total physical property. With the working capital $2,600,000 added, making $37,-399,131, the going value would be more than 14 per cent of the total property employed. The Commission here figures the going value in the Valuation Case to be 12.75 per cent, *including* the going value in the total. Including the going value boosts the total on which to base the lower per cent. That could be done *after* the going value is determined. Before it is fixed one would have only the property upon which to estimate its per cent. The going value is not property but an arbitrary addition to the property as defined above. From above analysis it is further evident that the Commission in the Valuation Case did not fix $5,818,000 as the final going value.

Commissioner Calfee in his dissenting report said he thought 10 per cent of the value of the physical properties was sufficient for going value.

Since the Commission in this case has adopted the going value of the plant as found in the Valuation Case, and since the parties differ as to what it was, we must have recourse to the report in that case to find out what it was. That report in this collateral proceeding is conclusive upon us unless unreasonable or unwarranted by the facts. It shows that the valuation of the physical property was not based solely as shown above upon the reproduction cost. The order states that the Commission took into consideration "all elements of value tangible and intangible" and, Calfee, said, made a "lump sum" valuation. What can that mean except that no definite going value was fixed? The property was viewed as a whole, all elements considered, original cost, going value, etc., and viewed as a whole—what was it *worth* as a going concern? What would it sell for? What return would it yield on what value as a rate base?

There is respectable authority for the conclusion that an estimate of the value of the property cannot be made unless it *is* a going concern, and that going value as an element should not be given independent expression. [51 C. J. p. 22, note 22.]

The giving of separate, expression to going value has always been approved in this State, but we know of no ruling which compels the Commission to do it, provided going value is considered in an adequate estimate of fair value of a plant. It was not separately valued in the Valuation Case if the concluding language of the report quoted above means anything.

The Commission in this case did not adopt that method and did not attempt to do so. After adopting the fair value found in the former case, it then followed the rigid method of taking reproduction cost and subsequent changes, giving each item its value with no attempt at "lump sum," fair value finding as in the Valuation Case. Yet it did fix a definite going value as of the date of the finding, at $5,818,000, as the finding in the Valuation Case, when it could not have been the ultimate conclusion in that case, where it was a tentative finding, subsequently modified in the lump sum conclusion of fair value.

In general going value cannot be measured by any definite formulas, but is controlled by the particular facts in each case. [Des Moines Gas Co. v. Des Moines, 238 U. S. 153.]

The City introduced Mr. John Bauer, an economist of experience, who testified to changes in conditions since 1925, such as decrease in prices of material, increase in efficiency of labor, the changes in the physical value of utility properties and decrease in earnings of such property. The witness in answer to questions by the Commission said that his criticisms were also directed at the method of finding going value in the Valuation Case, the witness assuming as did the Commission that it was definitely $5,818,000 instead of a modification of that estimate in the lump sum fair value finding.

However there is important evidence in the record as to changes since the former finding. For instance the heavy retirement of gas mains, services, lights, etc., mentioned above. The Company knew "as far back as 1923" that electric lights would supersede gas lights for public lighting. The Laclede Gaslight Company was incorporated in 1857. It actually started operations and furnished gas in 1873. Presumably it got a franchise and began to lay its mains at that time.

The Public Service Commission law was enacted in 1913. By that Act the State began for the first time to exercise its police power in regulating rates of public utilities, and base them upon the value of the property employed in public service. Before that no limit was placed upon the earnings of any such utility. [State ex rel. S. W.

Tel. Co. v. Pub. Serv. Comm., 262 U. S. 298.] Like any private enterprise, the owners had a legal right to make all the money they could, charge all the traffic would bear, restrained only by contracts, if any, with the cities or communities which they served. A municipality was under no obligation to see that they should receive an adequate return on their investments, and in turn limit their charges to consumers accordingly. When the Public Service Commission law went into effect, in exchange for investments with monopoly safeguards at lower returns, the public utility companies were released from the hazards of uncertain, unprotected ventures with unlimited returns: (The Minnesota Rate Cases, 230 U. S. l. c. 454.) The Laclede Gas Light Company for at least forty years was thus uncontrolled. It made its investments and took the incident risks. Possibly it made back in profits its original investment before regulation began in 1913, or it may have lost much or all of the original investment. Its promoters took the risk. As a going concern now the utility is worth what it is worth as such. It started as a lighter of streets and houses. Its mains were laid for that purpose. These lights have been steadily abandoned and the field surrendered to electricity, into which enterprise the Laclede Company itself as its own competitor is entering. Electricity is encroaching upon its field for power and heat. While losing to electricity in those respects it has no doubt found additional customers for cooking. Nevertheless, gas from powdered coal, the record shows, threatens to render obsolete its machinery for manufacturing its present gas. Common knowledge shows us that natural gas is a still more serious threat to render useless all its manufacturing plants. Could anything more certainly affect the going value of this utility?

The reports do not show that these facts were in evidence at the time of the Valuation Case. Since the Commission in the Valuation Case, on its final fair value finding fixed no separate going value the Commission in this case should have made a determination of its own.

The Commission in the Valuation Case gave weight to original cost of the gas plant which was placed at $27,500,000. [P. U. R. 1927B, l. c. 13.] The Commission in this case in the summary copied above included the cost of consolidation $1,000,000, making the total original cost $28,500,000.

The Commission in the Valuation Case considered the original cost as a factor in determining the fair value of the property. Any consideration given to the original cost in determining the going value would tend to reduce rather than to increase it.

We think the evidence of Bauer was worthy of consideration and might have been more fully developed.

The Company asked so large an allowance for depreciation reserve to offset its equipment as abandoned though not worn out, an accumulated fund which consumers would pay and which would add to the rate base, that it would thus artifically keep alive an earning capacity which the property itself did not possess. The practice would justify this general conclusion. The greater the earnings of a utility the higher the going value; the higher the going value the greater the earnings at the same rate of return, with an excuse for further added going value. Thus we reach the vicious circle! The more the going value is increased the more it must be increased.

In Springfield Gas & Electric Co. v. Pub. Serv. Comm., 10 Fed. (2d) 252, l. c. 266, the Federal District Court for the Western District of Missouri held that ten per cent of the replacement cost for going value was reasonable and proper. That was a live corporation with none of the elements of age, decay and obsolescence characteristic of the gas plant under consideration here. The court pointed out the percentage of allowance for going value allowed by Public Service Commissions varied from 27 per cent to 7.5 per cent. It is for the Commission and not the court to determine from the evidence what the going value should be unless such determination is unreasonable. We think the Commission, in consideration of the facts mentioned above, with a fuller examination of pertinent evidence relating to going value, would find it appreciably less than they stated they did in the report. It should be remembered that neither franchise rights nor good will can be considered in estimating going value. No doubt originally the Company had a franchise for it began business at a time when such corporations did not begin such service otherwise. If it had a franchise it may not have expired. Such franchise could not be considered.

VIII. PROPERTY NOT IN USE. A deduction of importance was property not in use. The City figured that in three items as follows:
"Water Gas Sets 8 and 9, Station 'A'.
"Coal Gas Retorts, Stations 'A' and 'B'.
"Auxiliary Plant of Coal Gas Plant, Station 'A'.
"Water Gas, Retort, Purifier No. 4 and No. 5.
"Buildings, Station 'A'.
"Total of above _____$ 727,691
"Producer Gas Equipment _____ 560,000
"Land Station 'H' and Coke Station _____ 198,149

"Total of Unused Items _____$1,485,840"
The Company claimed there should be no deduction for property not in use, that no property of the Company would become obsolete

in the reasonably near future, and it was manufacturing gas by processes generally used.

The Commission upon the evidence made the following finding:

"The Commission is of the opinion that the following property should be deducted from the value for rate-making purposes. The Commission does not believe that any deduction should be made at this time for the item of land.

"Water gas sets Nos. 2 and 3, Station 'A' _____ $ 31,000
"Water gas sets Nos. 4 and 5, Station 'B' _____ 40,000
"Coal gas retorts and structures, Rutger Street, Station 'A' _____ 368,000
"Producer Gas Plant _____ 506,000

    "Total _____$945,000

"The above deductions are made on the basis of the fair value of the items as found by the Commission as of October 1, 1925."

This finding was mainly in favor of the City. The first item in the City's claim of property not in use was reduced nearly half in the item $368,000.

The item claimed by the City's Producer's Gas Plant was reduced somewhat, as indicated by the report, upon the *value* of the property not in use and not as to whether it was used. The finding in that regard we cannot disturb.

The single item for land of $198,149 was disallowed entirely. The Commission says in its report that in the recent Valuation Case it had fully considered the item of land again claimed by the City as unused and at that time it was found useful, and included in the valuation of the property.

It is composed of two items:

    Coke station _____$176,669
    Station H _____ 21,480

               $198,149

As to these items Mr. Boyles, witness for the City, testified as follows:

"The other items listed are not-in-use Lands. At the Coke Station there is a certain amount of land that is within the city limits that is now idle and has been idle since this property was originally acquired. There is very little prospect, apparently, for the idle portion of this land being used because the company is now purchasing gas from other sources which would tend to limit any extension of their own manufacturing capacity, and even if that claim be disregarded the plant has capacity in other directions in which it could expand instead of occupying more land. What I had in mind was, if they did want to extend that plant the producer equipment which

I have shown as being idle would be used to liberate some gas from the ovens and that would still leave this land idle and not-in-use property. So even if you did consider that some of the idle land, or the idle producer plant would be used, the items that you did not use would still be in the not-used class.

"At Station H, the company has a large tract of land of which only one corner is used. This is a holder station which is located on the river front, and there appears to be very little prospect of extension of that station as the city is expanding away from this point, and it seems unlikely that additional holder capacity would be added in the section of the city where Station H. is located."

There was no contradiction of the facts stated by the witness. The Company in its brief contented itself with this comment:

"He admitted that the City had made a similar contention in the valuation case with respect to this land, and that he had offered no additional evidence *except that three years additional time had elapsed.* He admitted that he did not know what the plans of the Company might require with respect to these land items."

We think continuous non-use under the facts justifies a reconsideration of that item by the Commission.

IX. RATE OF RETURN. (a) We come now to the rate of return allowed by the Commission. The City cites cases from the Federal Court where it is held that a return of six per cent per annum upon utility values is not confiscatory. The Company, on the other hand, cites cases where a return as high as seven or eight per cent was held to be not unreasonable. The result of those authorities is that a certain limit of administrative discretion is allowed a Commission. Evidence was offered, as affecting this and the other question before the Commission, to show the rate of interest on the bonded indebtedness of the Company, but it was suggested during the hearing by Commissioner Porter that the Commission had nothing to do with that. The actual value of the property in use and an adequate return thereon under conditions existing was all that the Commission had a right to consider. The Commission found that the rate of 7-44/100 per cent was the earning and that 7½ per cent was not unreasonable. We are unable to say the finding is unreasonable.

(b) Certain expenses of operation were in dispute on that point. The City objected to the inclusion of the management fee paid by the Company to its holding Company of $212,000. The Commission points out, however, that the Company made no claim for that in this proceeding, although it was included in their calculations in some of their exhibits.

The Commission also points out that general expenses had noticeably increased in late years and that those items of expenses were taken into consideration and adjustments made accordingly.

Another point made by the City is that the Company paid too much in the purchase of coke for making gas when the Company could have made the gas at a reduced rate. The report of the Commission's engineers however showed that the average cost of making gas of all grades, some of it higher and some of it lower, was approximately what it cost the Company by the purchase of coke.

The City complains of improper allocation of operating expenses, improper computation of outlets and urges other objections to the Commission's finding, objections based largely upon the City's interpretation of the evidence.

There was evidence *pro* and *con* as to other expenses all of which the Commission took into consideration in determining the expense it might incur. The Commission's accountants audited the expenses of the Company and thus guided the Commission in determining the expense of operating the plant. In that matter of adjusting the expenses so as to determine the cost of operation the City has not shown that the Commission acted unreasonably in finding the actual return and fixing the rate.

The City has not sustained the burden of showing that the rate of return is unlawful or so unreasonable as to authorize us to set it aside.

X. RATES TO CONSUMERS: The City complains that the rates to consumers allowed by the report are discriminatory and unreasonable. The original report of the Commission ordered that the Laclede Gas Light Company be granted permission to file for approval a schedule of rates applicable to the City of St. Louis in accordance with the findings of the Commission, as set forth in the report. That was after determining the valuation of the Company's property and a reasonable rate of earning on that property. In the majority report the Commission while setting out the original rates and the rates submitted by the Company did not comment upon the propriety of the rates to consumers, but Commissioner Porter in his concurring report makes this statement:

"The proposed rates are slightly discriminatory in favor of the industrial user. In resubmitting their rate schedules the Company can and should remove this discrimination."

The Company, March 28, 1929, pursuant to the orders of the Commission, filed a new schedule of rates with the Commission. The Commission then, March 30th, filed a supplemental report and order. In this supplemental order the Company was authorized to put into effect for a trial period of thirteen months the rates and charges for

gas and service to be furnished to the City of St. Louis as contained in the proposed schedule, and made the following Order No. 2:

"Ordered: 2. That said Company be required to keep a full and accurate account of its revenues and expenses, and file a complete report thereof, including with said report the number of consumers served in each class, the total amount of gas sold in each block of rates as authorized herein, and the revenues from the various classes of service, .together with such other information as may be necessary to make proper analysis of the effect of the rates herein authorized, at the expiration of a period of twelve months after the effective date of said schedule, which said report shall be in addition to any other report required by law, and the Commission shall retain full jurisdiction of the parties and subject-matter of this cause to change or modify the rates of said Company *at any time* upon the evidence and facts now before the Commission together *with such other evidence* that the Company or other interested parties may offer."

The City then filed a motion for rehearing on the supplemental order April 2, 1929, and in that motion makes this objection to the supplemental report.

"In further support of this Motion the City points out that the original Report and Order of January 15, 1929, and the Supplemental Reports and Orders of March 26, 1929, and March 30, 1929, were predicated upon the revenues and expenses, and the results of operation for only the first eight months of the year 1927; that the City is reliably informed that the results of operation for the entire year 1928 will be available in about one week."

The Commission considered at some length the City's objection to the rates. The City then in its assignment of errors in this court makes the same complaint as that quoted from the motion for rehearing filed with the Commission. These rates were put into effect for a period of twelve months following the effective date of the schedule as shown by the supplemental order, nevertheless the Order continues by saying:

"The Commission shall retain full jurisdiction of the parties and the subject-matter of this cause to change or modify the rates of said Company *at any time* upon the evidence and facts now before the Commission *together with such other* evidence that the Company or other interested parties may offer."

That does not mean that the adoption of any rates for the purpose of experiment is conclusive even during the experimental period.

On a rehearing and a probable readjustment of values this schedule will necessarily be modified. The complaint is the premature and inadequate examination of former rates before the new order went into effect by which to make comparison but that matter is left en-

tirely open to be determined on the petition of the Gas Company or at any time it sees fit to present the petition.

The City in its points and authorities makes one other point relating to the exclusion by the Commission of testimony offered by the City to show the rates that were charged by the St. Louis County Gas Light Company. It cites authorities to the effect that there is no better test to be found regarding the propriety of rates "than the rates customarily charged in the localities similarly situated."

The Commission in rejecting that evidence said that they must be governed by the facts pertaining to the particular utility under consideration and there was no showing that the conditions as to the Laclede Gas Light Company and the St. Louis County Gas Light Company were comparable. The City does not claim that there was any such evidence; made no offer of proof that conditions in the county were similar to those in the City in regard to the expense of furnishing gas. Therefore we are unable to say that the Commission was in error in rejecting that evidence.

The former rates enforced before this investigation showed a minimum rate of fifty cents up to 500 cubic feet; the Company proposed a minimum rate of 90c up to 400 cubic feet. The Commission allowed in the authorized tentative experimental schedule a minimum rate of 75c up to 300 cubic feet. Those rates were greatly reduced as the amount increased in largely increased consumption. The rates were not appreciably less for large consumers than they were under the old rate. The Commission devoted several pages of its report to explanation of its action in adopting the experimental rate stating that there were a large number of consumers who used so little gas, from whom so small a revenue is derived that the existing rates did not pay for the service rendered. Some of them were called convenience customers. Some got service for which they did not pay. There was necessarily some discrimination between individual consumers within a given class. "But on the other hand the rates are made to apply to a class of consumers as a group and not to industrial consumers." The Commission then went into an explanation of the number of consumers; the small consumers; amount of gas consumed; the expense of installing service; the amount of expense which should be allocated to each consumer. The Commissioners by reason of their experience are much better able to judge the effect and the propriety of the schedules upon which they decided than we are. They had all the facts before them.

Commissioner PORTER in his concurring report made this observation:

"I am in accord with the rate schedule found in the report. The old schedule discriminated against the good customer of the Company and in favor of the 'convenience user.' Contrary to popular

belief the 'convenience user' is not found as a rule among those of small income. He is found among those whose income and inclination permits them to eat away from home and who, having the same equipment as other customers, uses gas infrequently. The new rates are aimed to correct this situation and will undoubtedly distribute the cost of service more equitably. The maximum increase to any one customer will be forty-four (44) cents.''

Since this is an experimental schedule and since the City in its assignment of errors complains only of the manner in which the Commission arrived at that schedule we are unable to say that the Commission was either unreasonable or unauthorized in adopting the rates it did for experimental purposes. The City has presented no authority to the contrary nor any reason why the method is improper. [State ex rel. Washington University v. Pub. Serv. Comm., 308 Mo. l. c. 347; State ex rel. City of St. Louis v. Pub. Serv. Comm, 317 Mo. 815, l. c. 825.] On a rehearing a change in the valuation may affect all the schedule of rates.

The judgment is reversed and the cause remanded with directions to the circuit court to remand to the Commission that it may rehear and determine the facts in accordance with the suggestions in this opinion.

All concur. *Atwood, C. J.,* in the result; *Ragland, J.,* takes no part in the decision.

## SUPPLEMENTAL OPINION ON MOTION FOR REHEARING.

WHITE, J.—The Laclede Gas Light Company in its motion for rehearing has so misjudged the opinion that lest its misunderstandings make difficulties in a rehearing before the Public Service Commission it is important that the ineptness of some of the points made be noticed.

I. It is first charged that this court's rulings were in ''conflict'' with ''express statutes'' governing its jurisdiction, ''to which the attention of the court was not called through inadvertence of counsel.'' The writer of the motion ''through inadvertence of counsel,'' of course, failed to notice that the opinion cited, quoted and construed each and all of those statutes, outlined the court's duty under them and followed their requirements.

In like manner it was overlooked that the Company failed to appeal from the judgment of the circuit court affirming the report of the Commission on account of which the Company is not in position to complain of this court's approval of several findings of the Commission.

II. The inquiry started with the fair value of all the property found in the Valuation Case $45,600,000, and concerned only changes since that date, though the motion asserts error to the contrary.

It is well to keep in mind the purpose and effect of the Public Service Commission law, that the community served by a public utility shall protect the investment in such utility against loss:

(a) Where the property employed becomes impaired or wears out in the service so that it must be repaired or replaced, and

(b) Where the property depreciates by wear and tear and is *not* repaired or replaced.

The former is cared for as a part of the operating expenses, and the latter is made good by the depreciation reserve fund, kept at a figure to balance such unrepaired depreciation. All this comes out of the earnings at the expense of the consumers.

There is also depreciation and appreciation by fluctuation in values with no change in the efficiency of the property. Of this it was proper for the Commission to take account. The Company seems to agree that such decrease in values is the Company's loss as their increase is the Company's gain. The Company profited enormously by such fluctuation at the time of the hearing in the Valuation Case.

Besides all that there is depreciation by total abandonment of property not "used up" or worn out in the service and not repaired or replaced. In regard to this last the motion assumes a position in conflict with itself and contrary to that held by the Company in its original brief. It was the loss of this property that Commissioner Porter declared was not depreciation (in the sense that it should be made good), but "one of the hazards of the game." It was no longer used in the public service.

It is asserted in the motion:

"The court erred in holding that the fair value of abandoned property, including mains, entered into the estimates of the Commission and that the fair value of such property was not deducted from the former valuation."

Which amounts to an assertion that such abandoned property *was* deducted from the former valuation and that the Commission approved of the deduction. As proof that it was so deducted the motion continues:

"The evidence clearly shows, without dispute, that all property, when retired or abandoned, is charged off and written out of the plant account. Mr. White (the Company's Comptroller) testified: 'When property is retired we write it off the books at the figure included in the Commission's value.'"

Yet the motion further on calls attention to the passage in the opinion where it classed the abandoned lights and mains, which are never replaced, as a risk which investors in public utilities must take, and asserts that such a ruling is in conflict with controlling decisions and would result in confiscation in violation of Sections 21 and 30, Article II of the Missouri Constitution.

If the writer of the motion means that the opinion in the passage mentioned refers to something other than the abandoned property "written off the books" he has not read the context. If he means that abandoned property, he asserts that the court committed error in approving the Company's act; the Company voluntarily deducted the value of abandonments, but the court in holding it properly deducted permits confiscation.

There is no occasion for misunderstanding the plain designation in the opinion of property *not* "used up in the public service," as the motion says, but abandoned and never replaced, instancing the supersession of the gas lamps by electricity.

The record shows that such abandoned property was *not* deducted from the former valuation. Mr. White's statement that it was written off the books does not necessarily mean that the write-off was carried to the Commission so as to affect their valuation in this case.

It was the theory expressed throughout the argument in the Company's brief and elaborated in Mr. White's evidence, that the *reserve fund* should be sufficient to overcome abandonments, and charges on the Company's books were made accordingly. A depreciation reserve of 3.2 per cent was demanded to cover such retirements, and the motion for rehearing before the Commission assigned error for failure to allow it. The Commission allowed an annual reserve of 1.5 per cent and we held the finding supported by competent evidence without including the abandonments which the Company desired to have included. The Company, not having appealed, has now no right to complain of that holding. Under one of its present theories it is bound to concede the finding was correct.

All this occurred in considering the depreciation reserve. No mention was made of "writing off the books" the value of abandoned property when considering the value of the iron pipe mains nor in considering changes in the former valuation of other property. The Commission apparently was not apprised of such writing *off and took no notice of it* until the Company demanded an increase of the depreciation reserve sufficient to cover such property.

In order to account for that failure to mention abandoned property the motion for rehearing here says: (In this and the following quotations significant parts are put in italics.)

"Furthermore, it is clearly shown by the *record that additions and betterments are net, that is to say, that from the total of new property added is deducted the items retired or abandoned, so that* all property which is retired or abandoned is deducted from the valuation *automatically at the time it is retired.* Obviously, all property retired at the time of the Commission's valuation had been written off and was not included in the Commission's final figure because the Commission added only the *net additions.*"

That is explained further:

"By net additions and betterments is meant the total additions and betterments, *minus the property retired.*"

Those statements in the present argument are not supported by the evidence. The Company's motion for rehearing before the Commission contains the assignment of error:

"In holding that such items of property *or any items of property* the Company will not be allowed to make a *full deduction from the depreciation reserve fund.*"

If such property was automatically and voluntarily deducted from the valuation by the Company's action, how could the Commission's approval of that action be error?

The motion cites the page where Mr. White testified:

"The net additions and betterments made last year, after deducting the property written off from the gross amount added was $1,-200,000, the budget for 1928, I believe, calls for about $1,500,000 for plant additions. All this is new capital."

The witness refrains from saying that the write-off was reported to the Commission. The same witness, explaining the Company's exhibit 1-F, had just used this expression: "After crediting the reserve with the amount allowed by the Commission for depreciation expenses *and charging against the reserve the property retired during the year.*"

While the retirements were written off the books the charge-off was balanced by reprisals from the reserve fund, leaving the original valuation unaffected, so there was no "automatic deduction." In 1926, $275,900.56, and in 1927, $420,749.73, was diverted from the reserve fund to fill up the hole made in the value of the property by retirals. Those figures are the exact amounts of the retirals for those years, and kept the property at the same level of book value. Therefore there could have been no automatic deduction of those sums for the Commission to approve. In commenting upon those retirals the Commission in considering the reserve fund said:

"The Company estimates $1,450,000 worth of property will be retired in the years 1928 and 1929, and that such heavy retirals *will soon exhaust the reserve fund.*"

The witness said further:

"If the annual depreciation allowance is not increased and the charge-off continues as indicated the Company will have consumed its reserve by the end of 1929."

The property which is retired or abandoned was "charged off the books," but the amount was retained out of the reserve fund to balance the charge-off. The consumers pay it and the Company retained it to balance the retirements.

The record shows that the Commission did not deduct such retirements from the valuation, and took no account of them except in considering an allowance for the depreciation reserve in the future, in which they refused to allow a per cent sufficient to cover retirements.

What was *net* additions and betterments? It could not have been a balance of improvements after repairs and replacements.

The Company produced an exhibit showing the *"operating expenses"* for 1926, which contains the following:

"Maintenance—Mains _____$44,736.69
                    Services _____ 38,996.26
                    Street Lamps _____ 3,606.44
                    Meters _____ 86,732.72"

These sums added make _____$174,072.11, which does not include setting and removing meters. What does that mean unless the cost of the *new* mains, services, street lamps and meters are replacements, paid for as operating expenses? That was the way the property was "progressively improved," as alleged in the motion. Then what were "net" additions and betterments?

The report refers to the "last audit of the Commission's accountants showing the net additions" to the property "from October 1, 1925, to August 31, 1927," amounting to $2,713,311.95.

Mr. Houlehan, the accountant, refers to it:

"A *complete statement* of such expenditures detailed by primary accounts and by years, will be found herein," (referring to a part of the record not in the abstract), and the condensed figures were as follows:

"Additions and Betterments October 1, 1925 to
      August 31, 1927
"As shown by the books _____$2,780,624.58
"Our (the Commission's) adjustments:
   "Deductions _____$122,453.49
   "Additions _____ 55,140.86

   "Net deductions _____$ 67,312.63          67,312.63

      "As determined by us _____$2,713,311.95"

That amount by December, 1927, was increased to $2,922,881, the amount allowed by the Commission.

The witness explained further:

"The audit of *expenditures for additions and betterments to property* covered the period of October 1, 1925, to August 31, 1927. The audit was dated from October 1, 1925, because that is the date of our last audit and also the date of the last valuation fixed by the Commission. This report or audit shows, on page 3, *that the additions and*

*betterments as shown by the Company's books for the above period* of the audit is $2,780,624.58. We have made adjustments with a net reduction of $67,312.63, making the net additions and betterments for the period, as determined by us $2,713,311.95.''

There is no suggestion in the report nor in the evidence that the gross amount of Additions and Betterments during the period mentioned were more than $2,780,624.58, mentioned. The word ''net'' is not used anywhere except to designate the balance after subtracting $67,312.63 from that sum.

The net was found by deductions made by the Commission's Accountant, ''By an examination of vouchers, invoices, pay rolls, work orders and data we found necessary to make certain adjustments.''.

The final deduction of $67,312.63 from the Company's claim was due to erroneous bookkeeping. Obviously some items entered as additions were thought by the Commission not to be such, while other items were added. The retired property had nothing to do with it.

IV. A further elucidation of the point appears:

The Company's motion asserts a ''fundamental error'' where the opinion states (the motion calls it a ''holding''), that the depreciation reserve increased from $1,171,348.75 at the end of 1925 to $2,500,782.03 at the end of 1927. In fact those were the amounts at those dates. However the Company's accounts showed only $1,162,719.71, at the end of 1927. The Commission ordered the Company to restore to the fund four items aggregating $1,338,062.32, representing sums which the Company had improperly diverted to other purposes. That sum added to the Company figure made the total $2,500,782.03. Those restored sums had been diverted in previous years, so that there was practically little or no increase of the fund between 1925 and 1927.

The Company argues that this mistake as to *when* the final sum accrued, affected the court's approval of the Commission's allowance of 1.5 per cent for annual depreciation.

However, there was a ''fundamental'' omission by the Commission in that matter. The yearly accrual of the reserve fund is set out in a table, as follows:

| Year | Amount Set Aside | Retirals | Total in Reserve End of Year |
|------|------------------|----------|------------------------------|
| 1919 | ---------- | ---------- | $ 323,963.71 |
| 1920 | $360,000.00 | $103,494.52 | 580,469.19 |
| 1921 | 300,000.00 | 246,644.21 | 633,824.98 |
| 1922 | 413,782.50 | 520,139.42 | 527,468.06 |
| 1923 | 413,782.50 | 311,574.17 | 629,676.39 |
| 1924 | 413,782.50 | 205,168.02 | 838,290.87 |
| 1925 | 556,528.50 | 223,470.62 | 1,171,348.75 |
| 1926 | 413,782.50 | 275,900.56 | 1,309,230.69 |
| 1927 | 274,238.75 | 420,749.73 | 1,162,719.71 |

The first column shows the amounts accrued to the reserve fund each year. The middle column shows the retirals each year, subtracted from the accruals and the balance added to the total of the previous year (third column), to make total found at end of the current year. If those sums deducted from the reserve had remained, the fund at the end of 1927 would have been more than double the amount credited to it.

The Company instead of counting the retirals off the new capital used in additions and betterments, took the former value of such retired property from the earnings to fill up that chasm, leaving the former valuation unimpaired. According to the Company's theory, those retirals should be automatically deducted from the valuation and the Commission should have ordered those diverted sums restored to the reserve fund. The Commission on rehearing, considering the effect such items would have had on the reserve fund may see fit to reconsider the allowance for annual depreciation. That matter is for the Commission.

The Company used the money thus diverted for its own purposes, other than improvement of the property, unless as witness Boyles suggested it was used for additions and betterments for which the Company got full credit as an increase to the total value. If that is true the deductions from that reserve were counted twice, once to balance retirals, or to balance accruing depreciation, and once when used for additions and betterments.

V. The treatment of the iron pipe mains shows there could have been no automatic deduction of abandoned property from their value.

The motion asserts: "The court admits in its opinion that the report of the Commission does not show the method by which the Commission and its engineers arrived at the result."

On the contrary the opinion points out exactly the method, by reproduction cost. The only uncertain thing about it was whether the deduction of $560,000 was wholly on account of decrease in the price of pipe, or partly on account of the cost of laying it.

They were treated separately from the other property. The mains considered by the Commission were the *same* mains considered in the Valuation Case. The reproduction cost of those mains in 1923 and their reproduction cost in 1927, and an estimate for the "immediate future" of the price of pipe. There is no suggestion in the report that the quantity of mains of 1923 was diminished at the time of this hearing. Retirements and additions were not mentioned in that connection.

The motion alleges: "The Commission found a decrease in their 'fair value' of $560,000," meaning the fair value of the mains.

The Commission could not have so found. There was no separate fair value found of the iron pipe mains in the Valuation Case and the

Commission attempted none as of that date for comparison in this case. It could not subtract the separate fair value of the mains at the later date from the fair value at the former date when there was no finding, no estimate of such value at either date, and no mention of evidence of such separate value at either date. The Commissioners were men of experience and dealt in facts. They could not find in figures the difference between two estimates not expressed at all. According to the motion the Commission found a fact without mentioning.it in their report.

The abandoned mains for the most part were not separated in the evidence from the other abandoned property, and therefore there could have been no separate finding of its value to deduct from the former value of the mains which likewise was not separately found. In the many pages of evidence on the subject and in the four or five pages of the Commission's report, no mention is made of any element of value other than reproduction cost, the cost of pipe, the cost of laying it, with conflicting evidence as to the methods of figuring such cost.

Even if the Commission did roughly estimate the decrease in the fair value of the mains from 1923 to 1927, they failed to take into consideration the retirals for 1926 and 1927 which were charged against the reserve fund, so that the book value remained the same. The Commission did not interfere with that disposition, notwithstanding Commissioner PORTER's suggestion that the loss of such abandonments were a part of the hazards of the game. Besides the estimated retirements for the years 1928 to 1929 would be $1,450,000. The report fixes $47 a ton as the "proper cost" of pipe in estimating the fair value for the "immediate future." Those estimated retirements covered that same "immediate future." In that immediate future they would be worthless, and there is nothing to show that the Commission took that into consideration.

VI. The motion criticizes as inconsistent the statement in the opinion that a separate expression of going value was not necessary and the holding that the Commission should have made an independent finding of such value.

The Commission in this case did not find the going value, either as an independent statement, nor as included in a general fair value of the whole property. The opinion quotes from the City's brief a statement to the effect that it was impossible to determine from the finding of facts in the Valuation Case upon what the allowance was based. The motion quotes that statement *as an expression of the court*. The Company admitted that it did not know what going value was found in the Valuation Case. Therefore the Commission erroneously adopted *as* the former finding a sum which was not found. That misconstruction of the former finding made it necessary for the Commission to make an independent finding. The Company's motion

characterizes that ruling as charging the Commission with acting "unreasonably or unlawfully."

In this connection the motion expresses amazement at the court's "suggestion" that the Gas Company was seriously threatened with extinction. The court made no such "suggestion."

Some evidence of the Company's witnesses indicated it. In pointing that out the opinion calls attention to the countervailing evidence showing additional customers for cooking found by the Company, the very evidence quoted in the motion and claimed to have been overlooked. It did not appear from the report in the Valuation Case that all those facts were before the Commission at that time, but they were proper matters to consider in fixing the going value. In fixing it a franchise should not be considered.

VII. The motion charges several "errors" against the court which may be noted:

"In holding" that the original cost was 58 per cent of the reproduction cost found in the Valuation Case. The court did not figure it but took that estimate of Mr. White, the Company's Comptroller.

In characterizing as "heavy retirement," the abandoned gas mains, services, etc. The Commission used the expression and Mr. Houlehan, the Commission's accountant, called it "*extra* heavy retirements."

In "finding" that Mr. Boyles audited the Company's books. It was Mr. Houlehan who audited the books and Mr. Boyles testified about that audit or some other audit of the same books.

"In holding" that prices were at their peak in 1923, whereas the reproduction cost of iron pipe was not estimated at the highest figure then, but at $54 per ton by the Commission's engineer. The opinion gives the estimated value of 1923 "as found by the Commission's engineer's appraisal," and the figures are not disputed by the Company.

"Erred in holding" that the mains were installed long ago mainly for lighting streets and houses and little adapted to present purposes, because of "no evidence to support it."

Mr. Boyles testified that property retired since 1907 was in existence long before that date. The Commission in its report said the Company began operation in 1873, and expressed the "opinion that a large amount of property being retired was constructed prior to the organization of a depreciation reserve" in 1907.

The Commission would not make such a statement without evidence of facts to justify it. The retirement of mains showed them little adapted to present purposes.

Error in "holding" that the Commission erred in making no allowance for accrued depreciation after the valuation case up to the present time. (That refers to property still in use.)

There was no such holding. The court did not disapprove the Conclusion of the Commission which appeared to be that such depreciation was balanced by accruals to the reserve fund. If the property was "progressively improved," as the motion asserts, it was by repairs and replacements paid for as operating expenses at the expense of the consumers. It did not prevent progressive deterioration of the property not repaired or replaced.

Error in "holding" that no account was taken of shrinkage in value of the property. There was a mere mention of the fact and no holding or ruling on it.

VIII. In the opinion appears a statement that the reserve fund also be for "maintenance and repairs," as well as depreciation. That is incorrect,—a careless statement contrary to the context and the holding that maintenance, repairs and replacements are paid for as operating expenses. However, that was one theory of Mr. E. L. White, Comptroller of the Company, who, in speaking of the reserve fund said:

"Company Exhibit No. 1-E is designed to show the estimated allowance for *replacement, retirement and depreciation.*"

The Company is not prejudiced by the statement even if it were a final conclusion; both the operating expenses and the reserve fund are paid by the consumers and do not in any degree affect the Company's rate of return.

The motion should be overruled. All concur, except RAGLAND, J., who takes no part in the decision of the case.