STATE OF MISSOURI at the Relation and to the Use of CHICAGO GREAT WESTERN RAILROAD COMPANY, Appellant, v. PUBLIC SERVICE COMMISSION OF MISSOURI ET AL.—51 S. W. (2d) 73.

Division Two, June 10, 1932.

*Ryland, Stinson, Mag & Thomson* for appellants.

---

*NOTE: Opinion filed at October Term, 1931, April 8, 1932; motion for rehearing filed; motion overruled at April Term, June 10, 1932.

*D. D. McDonald* and *G. C. Murrell* for respondents.

WHITE, P. J.—The appeal is from a judgment of the Circuit Court of Cole County affirming an order to the Public Service Commission. The State Highway Commission filed its application, June, 1930, to effect an overhead crossing over the track of the Chicago Great Western Railroad between Beverly Junction and Weston, in Platte County. The Chicago Great Western comes from a northeasterly direction, crosses Bee Creek, and then curves around to the south along and near Bee Creek until it reaches Beverly Junction. The location of proposed crossing is about a mile north of Beverly Junction. Bee Creek curves around to the west and runs along the west of the track for about half that distance. A highway, Route 45, called a traffic relief route, proposed by the Highway Commission, comes from the west beginning at the Buchanan County line, and connects with Route 92 at Beverly Junction. It passes through the town of Weston which is four or five miles to the northwest of Beverly Junction. Weston had a population of about 2,000 people and it was estimated that from 1,500 to 4,000 cars would pass along this highway when completed.

The evidence presented by the Highway Commission tended to show that a grade crossing of the railroad at that point was impracticable: that the sight distance was short, only 50 to 100 feet, and to increase that sight distance would be very expensive. The cost of the overhead structure as estimated by the highway engineers would be $20,128.90 and the approaches would be $11,613.53, with a reinforced concrete crossing. By order of the Public Service Commission the cost was apportioned half to the Railway Company and half to the Highway Commission.

The commission in its report summarized the evidence fully and correctly. After stating the place and course of the proposed road, the report says:

"The proposed highway is on a new location, and it is impossible to obtain a traffic count, but it is estimated that Route No. 45 will carry between 2,500 and 4,000 vehicles each day after completion.

"The track which will be crossed, is the main line of company

between Chicago, Illinois and Kansas City, Missouri. The company operates four passenger trains at speeds of 45 to 55 miles per hour, and from five to seven freight trains at speeds of 30 to 45 miles per hour, each day, over the points of proposed crossing.

"The testimony shows that Bee Creek parallels. the track in the vicinity of the crossing, and that a county road also parallels the track to a point approximately 500 feet west of the point of proposed crossing. Said road then abruptly turns across the track at grade and continues into the town of Beverly. The State Highway Commission proposes to construct an approach between Route No. 45 and the county road that will allow travelers on said road to use the highway from the connection into Beverly. It is stated that the grade crossing will then be unnecessary and may be closed."

In relation to the claim of the company that the highway might have been constructed on the other side of the railroad between it and Bee Creek, the report said:

"Beverly is approximately one mile from the point of proposed viaduct, and the evidence shows that the land in this vicinity is exceedingly rough, that Bee Creek flows to within 40 or 50 feet of the company's right-of-way; and that a location of the highway as suggested would be difficult of construction, subject to overflow, subject to great maintenance costs due to the stream, and introduce considerable added curvature in the highway."

The commission further discussed the facts as follows:

"The evidence further shows that if a grade crossing were established at the point of proposed viaduct, a traveler on the highway could not see more than 100 feet in either direction along the track until practically upon same.

"In view of the facts relative to the topography of the country in this vicinity, and the evidence of the State Highway Commission's locating engineer relative to the consideration of a number of locations and the adoption of the one proposed as being the most practicable and economical, the commission is of the opinion that the proposed point of crossing is the only one that it should consider. A grade crossing would undoubtedly be extremely hazardous, and engineers of both the applicant and the defendant testified to this fact."

In regard to a contention of the company that a creosote wooden structure, which could be built for $5,800, would be more economical, the commission called attention to exhibits on file before it, showing that many railroads in the State use creosoted bridges to carry trains and vehicular traffic and then said:

"The evidence shows that the State Highway Commission has adopted concrete construction, such as proposed herein, as a standard; that all of the bridges built by it are of said standard; and that said

standard was adopted after study of practices in other states, and for the reason that it requires little if any maintenance, and has an indefinite life.''

And further:

''In considering whether concrete or creosoted timbers should be used in the proposed structure, the commission must consider the method in which the Highway Commission secures its funds for construction work. It does not receive funds from an established business and with regularity but must depend upon bond issues and the desire of the people of the whole State. It is common knowledge and is admitted that concrete construction has an indefinite life, barring accidents or poor construction, while creosoted timber construction has a rather definite life under varying conditions of use and location. It is general practice among railroads and others to replace timber structures with concrete and steel structures just as rapidly as they deteriorate or as it is financially possible, due to the ever present fire hazard and its consequent stopping of traffic, and the cost of maintenance and of frequent inspections.''

The Public Service Commission then ordered that the Highway Commission be granted permission to construct the reinforced viaduct as applied for, and make the necessary changes in telegraph and signal lines, and that the company be given permission to abandon the grade crossing at a point approximately 500 feet west of the proposed viaduct.

After its motion for rehearing was overruled the company sought by *certiorari* to have the court review the proceeding with the result mentioned.

Appellant does not deny that there was substantial evidence to support the finding of the commission. It presents only technical and legal objections to the conclusions.

I. Appellant relies upon the proposition that the Public Service Commission had no authority to locate the road in question or to consider questions in connection with the demands for it or the reasonableness of it, and therefore no question regarding the necessity, propriety or expediency of the overhead crossing was properly before the commission for consideration.

In City of Kirksville v. Hines, 285 Mo. l. c. 240, 241, 225 S. W. 950, this court held that questions relating to the necessity, expediency and propriety of extending streets and highways, even when they cross railroads, are not matters of consideration of the commission. The power is lodged elsewhere. In that case the court had under consideration a proceeding to extend a street across a railroad track. Counsel cites State ex rel. Terminal Railway Co. v. Public Service Commission, 308 Mo. l. c. 374, 272 S. W. 957, where that

734

passage cited from the Hines case was quoted at length. That was where the court had under consideration the extension of a street in Kansas City across a railroad track.

■ Statements of the court about the authority of the commission in such cases must be understood with reference to the matter they had under consideration. In the Kirksville case and in the Terminal Railway Company case it was held that a city exercised the power of eminent domain in extending its streets and the propriety of such extension, even across a railroad track was not for the Public Service Commission. Subsequent cases more fully explain the proposition. In State ex rel. Public Service Commission, 316 Mo. 1. c. 238, 289 S. W. 785, the matter was under consideration and the Kirksville case was cited where it was held that the Public Service Commission determines the particular *point* of crossing over the railroad tracks; that such authority is exercised as the police power of the State for public safety and it is a limitation upon the power of eminent domain granted to municipalities. There was a like holding in Railroad Co. v. State Highway Commission, 322 Mo. 1. c. 432, 17 S. W. (2d) 535.

Again in Kansas City v. Terminal Railway Co., 324 Mo. 1. c. 905, 25 S. W. (2d) 1055, the court quoted a passage from the Kirksville case and from the former Terminal Railway case, as follows:

" 'The (Public Service) Commission has the exclusive right to determine and prescribe both the manner of crossing and the apportionment of expenses.' "

The court said further:

"Plans may be submitted in the first instance by both the railroad and the municipality or by either. The final approval by the commission of a plan so proposed is the unrestrained exercise by it of 'the exclusive power to determine the manner of crossing.' "

The provisions of the Constitution in Section 44a, Article IV, define the power of the Highway Commission, "to locate, establish, acquire and construct supplementary State highways and bridges" etc.

And further:

"In order to connect State highways, as designated and laid out under existing law with other such highways or with highways in adjoining states, and also in order to facilitate and expedite the movement of through traffic, the State Highway Commission is hereby authorized and empowered to locate, construct and maintain . . . highways and bridges . . . and connect the same with the primary or secondary highways of the State."

And further:

"All the highways and bridges to be constructed and improved with the funds herein provided, shall be constructed, improved and maintained under the direction and supervision of the State High-

way Commission, which shall determine the width of right-of-way and surface, and the type and character of construction, improvement and maintenance.''

The present road under consideration is called a traffic relief road. It is, within the terms of Section 44a, a supplementary highway with a purpose to connect two highways of the State. The State Highway Commission has full power to locate roads, to proceed in condemnation of crossings, and to determine the propriety, expediency and necessity of such crossings. But as a limitation upon that power the Public Service Commission has authority to control railroad crossings (Sec. 5171, R. S. 1929), to determine and prescribe the *manner*, including the particular point of crossing, the separation of grades, the terms of installation, operation and maintenance, and apportion the expenses.

It is not claimed that any of the terms of that section are in conflict with Section 44a, Article IV, of the Constitution, which does not give the Highway Commission any authority over railroads or railroad property. It does not conflict with the authority and jurisdiction of the State Highway Commission to say then that the Public Service Commission must hear evidence upon the necessity or propriety and expediency of an overhead crossing, of a ''separation of grades'' at such crossing. While it was for the Highway Commission to decide whether there should be a crossing of the Chicago Great Western Railroad at that point, it was for the Public Service Commission to determine the particular point and the character and structure of that crossing.

II. The appellant challenges the sufficiency of the evidence to support the order of the Public Service Commission and in making that point seems to argue that we should weigh the evidence produced before the commission, and make a determination of our own on the facts as we find them.

In making that point appellant cites opinions of the court which did not receive a concurrence of a majority of the court.

It was said by the Court en Banc in Railroad v. Public Service Commission, 266 Mo. l. c. 341, 181 S. W. 61, on consideration of a review of the orders of the Public Service Commission:

''The trial in this court is practically *de novo*, and after due consideration given to all the evidence the court will accept, modify or reject the findings of the circuit court and make such findings as the law and evidence may warrant.''

In that a majority of the Court en Banc concurred and that statement has been carried down in later cases.

Appellant cites Lusk v. Atkinson, 268 Mo. 109, 186 S. W. 703, which

followed the *dictum* quoted from the railroad case. But three judges dissented and one concurred only in the result.

In State ex rel. v. Public Service Commission, 271 Mo. 155, 196 S. W. 369, cited by appellant, the judges of Division One divided in four diverging interpretations of the functions of this court in such a review.

The appellant also cites in State ex rel. Power & Light Co. v. Public Service Commission, 310 Mo. 313, l. c. 333, 275 S. W. 940, where the ruling in Railroad Case, 266 Mo. 341, 181 S. W. 61, was approved by Court en Banc, quoting the statement that each case must be tried the same as equity cases *de novo*. In that case one judge only concurred, two judges concurred in the result, two judges dissented and one judge was absent.

The impropriety of that statement in the Railroad Case, 266 Mo. 341, 181 S. W. 61, is apparent. ▉ Neither the circuit court nor this court tries *de novo* a case on review of an order of the Public Service Commission in the ordinary sense of that term. The circuit court does not take evidence; it has only the evidence and the record made by the Public Service Commission; it cannot make a finding of facts as stated in the railroad case; it is limited by the terms of Section 5234, Revised Statutes 1929, which provides that the circuit courts upon a review of the decisions of the commission shall try and determine the cases as suits of equity, but it limits the action of the court to a reversal or an affirmance of the order of the commission on the record made before the commission. Later cases have further explained the function of the courts in dealing with such orders on review. In State ex rel. Motor Bus Co. v. Public Service Commission, 324 Mo. 270, 23 S. W. (2d) l. c. 117, it was said that if the chancellor on a review of an order of the Public Service Commission should make a finding of facts he could make no use of it further than to determine whether the order is reasonable and lawful; if it is it must be affirmed. The chancellor cannot modify the commission finding nor make one of his own. In State ex rel. Henson v. Brown, 326 Mo. 230, 31 S. W. (2d) l. c. 210, this court again said that the court's authority is limited to an affirmance or reversal of the order of the commission; that the circuit court was in error in attempting to substitute its finding for the finding of the commission.

▉ Section 5247, Revised Statutes 1929, provides that the burden of proof shall be on the party seeking to set aside any determination, direction or order of said commission, to show by clear and satisfactory evidence that the determination, requirement, direction or order of the commission complained of is unreasonable or unlawful.

▉ The determinations of the commission in this case were supported by substantial evidence and the orders not unreasonable or

unlawful and therefore are conclusive upon this court. [State ex rel. Jenkins v. Brown, 323 Mo. l. c. 386, 19 S. W. (2d) 484.]

III. Appellant further claims that the order of the Public Service Commission in this case is in violation of the due process clause of the Fourteenth Amendment to the Federal Constitution and to Section 30, Article II, of the Constitution of Missouri.

The due process clause as applied generally means simply according to the law of the land. It is not claimed that the provisions of the Public Service Commission law which we have quoted are unconstitutional. As applied to judicial proceedings the due process clause simply means that a party shall have his day in court. [12 C. J. 1188 to 1192.] The evidence in relation to the propriety and necessity of the overhead crossing was conflicting. The State Highway Commission had determined that there should be a crossing there and offered evidence in support of its propriety. The Company offered evidence against it. It was for the Public Service Commission to select the exact point and determine whether it should be an overhead crossing.

The evidence justified the commission in determining that a concrete overhead crossing was the most appropriate solution of the traffic problem at that point. This was in the exercise of the police powers for the safety of the traveling public. We cannot find that the determination was unreasonable or unlawful.

The judgment is affirmed. All concur.