STATE OF MISSOURI at the Relation of KANSAS CITY POWER & LIGHT COMPANY v. PUBLIC SERVICE COMMISSION ET AL., Appellants.

STATE OF MISSOURI at the Relation of MISSOURI POWER & LIGHT COMPANY v. PUBLIC SERVICE COMMISSION ET AL., Appellants.

STATE OF MISSOURI at the Relation of MISSOURI GAS & ELECTRIC SERVICE COMPANY v. PUBLIC SERVICE COMMISSION ET AL., Appellants. —76 S. W. (2d) 343.

Division One, November 16, 1934.

*D. D. McDonald* for Public Service Commission.

*Chas. H. Mayer* and *Mayer, Conkling & Sprague* for St. Joseph Railway, Light, Heat & Power Company.

*Charles M. Blackmar* and *Ralph M. Jones* for Great Lakes Pipe Line Company; *Merservey, Michaels, Blackmar, Newkirk & Eager* of counsel.

*Johnson, Lucas, Landon & Graves, Wm. C. Lucas, Thad B. Landon* and *Ludwick Graves* for Kansas City Power & Light Company.

*Ralph D. Stevenson, A. Z. Patterson* and *Noah W. Simpson* for Missouri Gas & Electric Service Company.

*Noah W. Simpson* for Missouri Power & Light Company.

FERGUSON, C.—This consolidated case recently came to the writer on reassignment. This proceeding was commenced by the St. Joseph Railway, Light, Heat & Power Company making application to the Public Service Commission for the necessary certificate or permit to authorize and permit it to build and operate an electric transmission line to a pumping station of the Great Lakes Pipe Line Company located in Clay County. The Kansas City Power & Light Company, the Missouri Power & Light Company and the Missouri Gas & Electric Service Company intervened and opposed the application of the St. Joseph Company. The Pipe Line Company also intervened but appeared in support of the application. Upon a hearing the Public Service Commission made an order granting the application and thereafter overruled the separate motions of the three protesting interveners for a rehearing. Thereupon the three protesting interveners, separately, applied to the Circuit Court of Cole County for a writ of review. In the circuit court the three review causes were consolidated and after a hearing the circuit court entered a judgment reversing the order of the commission "as being unlawful and unreasonable." The Public Service Commission will generally hereafter be referred to as the Commission; the St. Joseph Railway, Light, Heat & Power Company as the St. Joseph Company; the Great Lakes Pipe Line Company as the Pipe Line Company; the Kansas City Power & Light Company as the Kansas City Company; the Missouri Power & Light Company as the Missouri Company and the Missouri Gas & Electric Service Company as the Service Company.

The territory involved, into which the transmission lines of the four electric companies extend, as shown by the various maps filed as exhibits, includes the counties of Buchanan, Clinton, Platte and Clay, or, as described in the report and order of the Commission, that territory south of an east and west line passing through the

cities of St. Joseph and Osborn (in Clinton County, near the north line thereof) bounded on the west and southwest by the Missouri River and "coming more or less to a point at Kansas City. St. Joseph and Osborn are approximately twenty-six miles apart on almost a direct east and west line." Kansas City is approximately forty-two miles south of that east and west line and fifteen miles east of a direct line south from St. Joseph and eleven miles west of a direct line south from Osborn. Along the east side of the territory described the Missouri Company has transmission lines extending northward from Liberty, Missouri, and serving the cities of Kearney, Holt, Plattsburg, Lathrop and Osborn. A 33,000 volt line of the Kansas City Company extends northeastward from its generating plants in Kansas City to a point near the city of Liberty (Clay County) where it connects with transmission systems of the Missouri Company and the Service Company and delivers electricity generated by the Kansas City Company to these two electric companies at wholesale rates fixed by a long term contract. The Kansas City Company also has a 33,000 volt line extending northwestwardly and then north to Ferrelview where it delivers electricity at wholesale rates, fixed by said long term contract, to the Service Company for distribution by it over its transmission lines extending from that point. The Service Company does not own or operate any generating plant and is dependent for its electrical energy requirements upon its contract with the Kansas City Company for supplying same at the rates and quantities thereby fixed. The Kansas City Company delivers current to the Service Company, at Ferrelview, at 13,200 volts. From Ferrelview, the Service Company has two separate 13,200 volt lines to Smithville; from Smithville it has a single 13,200 volt line to the town of Trimble and thence west and north to Edgerton in the northeast corner of Platte County. From a point on Highway 169 known as Paradise Junction, about midway between Smithville and Trimble, a 2,300 volt line extends east about two and one-half miles to the town of Paradise. The Service Company also has transmission lines extending from Ferrelview in a northwestwardly direction through Platte City to Weston and from a point west of Platte City north through New Market and Dearborn to the town of Faucett, in Buchanan County, ten miles southeast of St. Joseph. The St. Joseph Company, a Missouri corporation, operates an electric generating plant at St. Joseph with a generating capacity of 22,000 kilowatts; it also has an interchange contract with the Kansas Power & Light Company providing primarily for standby service. It has a 22,000 volt line around the city of St. Joseph. Its lines run in all directions out of St. Joseph. One 6900 volt line extends southeastwardly, a distance of about thirteen miles, to the town of Gower in Clinton County, in which the St. Joseph Company maintains an electric

distribution system; from Gower said line continues in a southeast-wardly direction for about eleven miles to a point near the city limits of Plattsburg. Plattsburg, as we noted, is reached and served by the distribution system of the Missouri Company. Thus it will be seen that the lines of the three electric utility companies, the St. Joseph Company, the Service Company and the Missouri Company, as presently extended, approach, and to a certain extent encroach upon, each other very closely at several points. Upon examination of a map showing in full all the various lines of these three companies it would be difficult to denominate or designate any certain point at or near the central part of the area here mapped and considered which is not at present actually reached and served by the lines of one of said companies and which is within such a distance of the generating plant or source of supply of either company that it could erect transmission lines thereto which would adequately, efficiently and profitably meet the electrical service requirements thereof, as being, under sound principles of regulation, the natural and exclusive territory of either of the three companies.

In May, 1931, the Missouri Company and the Service Company entered into a territorial agreement which was filed with and approved by the Commission by its order made in case 7327. This was a voluntary territorial agreement as between these two companies. The original voluntary agreement, and order of the Commission approving same, fixed a north and south dividing line through Clay County as between these two companies. The St. Joseph Company was not a party to this agreement and had no knowledge of the proceeding (case 7327) before the Commission whereby the division of territory in Clay County was made as between these two companies. Later under date of September 24, 1931, the two companies, the Service Company and the Missouri Company, entered into an amended or supplemental territorial agreement whereby they agreed that, as between themselves, the north and south dividing line theretofore established through Clay County should be continued and extended westwardly a specified distance along the north line between Clinton and Clay County thence north into Clinton County and thence in a zigzag line northwestwardly, in Clinton County, to the east line of Buchanan County. The two companies then made a supplemental application to the Commission for a further order in case 7237 approving their amended territorial agreement extending the agreed dividing line as between themselves. Thereupon the St. Joseph Company having had notice of such supplemental application and being concerned as to the effect thereof intervened and filed a protest with the Commission. The order of the Commission making the St. Joseph Company a party intervener in such supplemental proceeding was made on December 17, 1931. On the next day, December 18, 1931, the Missouri Company and the

Service Company filed with the Commission their joint stipulation amending their then pending supplemental territorial agreement, entered into on September 24, 1931, to provide that said agreement "is not intended to establish a boundary line between the Missouri Power & Light Company and the St. Joseph Railway, Light, Heat & Power Company nor between the Missouri Gas & Electric Service Company and the St. Joseph Railway, Light, Heat & Power Company." Upon learning of the amendment, exempting it from the effect and operation of the territorial agreement between the Service Company and the Missouri Company, the St. Joseph Company on December 26, 1931, withdrew its protest and objections theretofore filed and thereafter on January 20, 1932, the Commission issued its supplemental order No. 1 in case 7237 relocating and re-establishing the territorial division line in Clay and Clinton counties between the Service Company operating on the west and south thereof and the Missouri Company operating on the east and north thereof as agreed upon by them. There was also an agreed division line between the Kansas City Company operating south thereof and the Service Company and the Missouri Company with their distribution systems north thereof. This line runs in a general east and west direction across the southern part of Clay County a short distance south of Ferrelview the point of delivery of electrical current purchased by the Service Company from the Kansas City Company.

The foregoing sketches in a very general way the relative situation of the four electrical companies, parties hereto, at and during the time involved in this inquiry. The Great Lakes Pipe Line Company is a common carrier engaged in the transportation of petroleum products by means of a pipe line. It owns and operates a gasoline pipe line running in a general northeastwardly direction from the Oklahoma fields to Des Moines, Iowa, thence eastwardly to Chicago and northwardly to St. Paul and thence westwardly to Omaha. This pipe line passes near Kansas City, Missouri, and runs in a practically straight line northeastwardly across the northwestern part of Missouri passing near the town of Osborn, in Clinton County heretofore noted. The pipe line was completed in the fall of 1931. There was twenty-one primary booster stations along the entire line. Two or three of these primary booster stations were between Kansas City and Des Moines. There was one such station adjacent to Kansas City, Kansas, and within the acknowledged and recognized field of electrical service of the Kansas City Company. The first primary booster station north of Kansas City was located about a mile east of Osborn "right under" the lines of the Missouri Company serving that town. However both the Kansas City and Osborn booster stations were operated by Diesel oil engines. In fact only one of the Pipe Line Company's twenty-one primary booster stations, the one at Des Moines, had been electrified though such stations were susceptible

to electrification where satisfactory service, at rates comparable with the cost of Diesel engine operation, was available as the electrification of the station at Des Moines indicates. Shortly after the pipe line was completed and put in operation the officials of the Pipe Line Company began to investigate and discuss the need and possibility of increasing the capacity of the line. To accomplish this it was decided to construct intermediate or secondary booster stations between certain primary stations and about the first of March, 1932, plans were completed for the installation of one of these secondary pumping stations near Bonita, Kansas, about twenty-five miles southwest of Kansas City and another one in Clay County, Missouri, about two miles east of the town of Paradise which point is about midway between the primary station near Kansas City and the one at Osborn which are forty-eight pipe line miles apart. This site is approximately twenty-seven miles southeast of St. Joseph and twenty-two miles northeast of Kansas City and about the center of the territorial area heretofore described. The Pipe Line Company decided to operate all the proposed secondary pump stations by electricity instead of Diesel oil engines if satisfactory and adequate electrical service at rates comparable with the cost of operation of Diesel engines could be obtained. Accordingly about the first of March, 1932, it approached and entered into negotiations with the Kansas City Company relative to the electrification of the Bonita station but after a day to day discussion extending over a period of several weeks the negotiations were terminated about April 10, and the plan to electrify the Bonita station abandoned. The Kansas City Company did offer a special rate schedule for the proposed service to the Bonita station but it was complicated and difficult of calculation or adjustment and deemed wholly unsatisfactory for the type of service required. It will be recalled that the Service Company had a 2300 volt line sufficient merely to meet the local service requirements, into the town of Paradise. In the meantime the Pipe Line Company approached the Service Company relative to electrification of the secondary pumping station which it proposed to construct near Paradise. It will be noted here that under the territorial agreements among the Kansas City Company, the Service Company and the Missouri Company the site of this proposed new station is in territory allotted thereby to the Service Company. As early as April 7th the Service Company's engineers made a survey of the project and investigated the requirements of the Pipe Line Company but the Service Company made no proposal or offer and not having had a reply to its inquiry concerning electrical service for the station to be installed near Paradise, the Pipe Line Company wrote a letter to the Service Company, under date of April 30, 1932, making further inquiry as to whether the Service Company was interested in furnishing electrical power to that station. The Service Company

refused to make a definite proposal but under date of May 9, 1932, its vice president and manager wrote a letter to the Pipe Line Company offering to supply electrical service to the proposed station near Paradise on the same basis and at the same schedule of rates which the Kansas City Company had previously proposed for the Bonita station and which, as the Service Company officials must have known, had been rejected by the Pipe Line Company as unsatisfactory for that type of service but even the offer thus made was conditional. After proposing the same .rates and terms theretofore rejected by the Pipe Line Company the letter specifies that "this offer is made on condition that we are able to obtain power from the Kansas City Power & Light Company as we buy our power from that company and upon our ability to obtain this power at a cost that will reimburse our company for handling this load." It will be remembered that the Service Company had no power of its own but purchased all the power it distributed from the Kansas City Company and it appears that the terms and rates fixed by its contract with the Kansas City Company were such that the Service Company was not in a position to meet the requirements of the Pipe Line Company and before it could undertake to supply the quantity of electricity which would be required by the Pipe Line Company, even at the rate offered, it would be necessary for it to negotiate a new contract with the Kansas City Company and the vice president and manager of the Service Company testified, that, by reason of that situation, "I wrote this letter (of May 9) so that it wasn't binding unless I could get a signed contract" with the Kansas City Company. That seemed to be the end of the matter so far as the Service Company was concerned. It made no further effort to obtain this business. It did not again communicate with or approach the Pipe Line Company or manifest any further interest in the matter. The Service Company manager as a witness, admitted that so far as that company was concerned the Pipe Line Company was thereafter "left . . . to buy current somewhere else or put in a Diesel engine." Having failed to obtain the desired service at a rate deemed comparable with Diesel engine operation and the Service Company having apparently wholly abandoned the matter the Pipe Line Company on May 21, 1932, for the "first time, approached the St. Joseph Company relative to obtaining electrical service from that company.

It appears that the St. Joseph Company had for some time been interested in the desirability and practicability of substituting electrical power for Diesel engines at stations on this and other pipe lines. It had become interested in the Power Club movement having such objective. The Power Club was an association of power and pipe line companies of the middle west district to work out a uniform type of rate and contract between the electric power companies and the pipe line companies covering this type of service. The St. Joseph

Company is a Cities Service subsidiary and it had obtained information concerning the subject from and through other electrical companies, members of the Cities Service group, which were supplying such service to pumping stations on other pipe lines. The St. Joseph Company was thus prepared to give the Pipe Line Company's inquiry prompt and immediate consideration.

Conferences were had with the Pipe Line Company officials, an agreement reached and a contract submitted and executed on May 28, 1932, subject of course to approval by the Commission. Because of the topography of the territory along that sector the capacity of the Pipe Line between Kansas City and Osborn was less than its capacity beyond that section of the line and extra pressure was necessary to increase such capacity. The installation of the station near Paradise would increase the capacity over the entire line and make possible an additional capacity of about 200 barrels per hour. The Pipe Line Company was under obligation to deliver the increased amount of gasoline, which it would thus be enabled to carry, over this line by August 1st. The pumping station required continuous twenty-four hour service and assurance of continuity of service direct from the generating plant was desired by the Pipe Line Company and considered by it to be of the utmost importance. The Pipe Line Company estimated the cost to it of the construction and equipment of this station at approximately $40,000. The pump at this station was to be driven by a 700 horse power motor requiring a capacity of 450 kilowatts and as stated ''this 450 kilowatt load would be a twenty-four hour load.''

The proposal of the St. Joseph Company met all the requirements of the situation and the rate agreed upon was satisfactory. The rate at which the St. Joseph Company proposed to furnish electrical service to this station was in line with the Power Club rate and was developed by the St. Joseph Company as the best form of rate for this type of service. This rate was based, as we have noted, upon the experience of its sister companies in supplying such service of which the St. Joseph Company was informed. The rate proposed and agreed upon was also worked out as competitive with other forms of power particularly the Diesel oil engine. As we shall later note the protesting companies eventually abandoned the schedule of rates which they had offered and acknowledged and conceded that this rate, worked out and proposed by the St. Joseph Company, was a fair and proper rate for this class of service.

The St. Joseph Company proposed to rebuild its existing line to Gower changing it from a 6900 to a 22,000 volt line tied in with its 22,000 volt loop circuit serving St. Joseph and extend the line from Gower as a new 22,000 volt line southeastwardly to the pumping station. Its patrons at Gower and its rural customers along the line from St. Joseph to Gower would be served by placing a single phase

6900 volt circuit on the same poles used to carry the 22,000 volt line direct from the generating plant to the pumping station giving the station the individual, continuous service, with no other service connected therewith, desired by the Pipe Line Company. The total cost to the St. Joseph Company of the construction, of such line and the installation of all necessary equipment was estimated at $28,600 while the gross revenue which it would receive from the station was estimated at $26,000 annually.

A complete agreement having been reached the St. Joseph Company on the 11th day of June, 1932, filed its application, with the Commission, for the necessary certificate authorizing it to build such power line, and supply electrical service, to said pump station. The application was set for hearing on June 24. On the 17th day of June the Kansas City Company filed an intervening petition which is in effect merely a protest against the granting of the application of the St. Joseph Company. It contains no proposal or offer on the part of the Kansas City Company to supply the service required by the Pipe Line Company. The Missouri Company filed a protest which is confined wholly to a protest against the granting of the application on the ground that to permit the St. Joseph Company to serve this pump station would be in contravention of the orders of the Commission in case 7237. The Service Company also filed a protest against the granting of the application the effect of which was that the order of the Commission, in case 7237, approving a territorial division line between it and the Missouri Company was a bar to the construction of the proposed line by the St. Joseph Company to this pump station, the site of which was in Clay County and west of such division line and therefore in territory which was by such agreement and order allocated to it, and then asserts that it is "ready and willing to do and perform any and all required service as a public utility" in the field allotted to it in case 7237 "and to faithfully comply with any and all additional reasonable orders of the Commission incident thereto." The Service Company did not have the electrical current at its disposal to supply this service, nor any contract therefor, and therefore was not in a position to adequately meet the requirements, or serve this station, of the Pipe Line Company at the time its protest was filed. As stated in the beginning the Pipe Line Company intervened in support of the application of the St. Joseph Company.

The testimony shows that the site of the pumping station is slightly to the west of the center of an area approximately twenty miles in length, north and south, and varying from eight to twelve miles in width, east and west, in which there are no electrical transmission lines. This area is bordered on the north by the lines of the St. Joseph Company extending to a point near Plattsburg; on the east by lines of the Missouri Company and on the south and west by

the lines of the Service Company. While the 2300 volt branch line of the Service Company extends to Paradise it is wholly inadequate and of concededly insufficient capacity to carry the load required for the pump station. In fact, as with the St. Joseph Company, in order for either of the three protesting companies to serve the pump station it would be necessary to reconstruct present lines, increasing the capacity thereof, build entirely new and additional lines over certain distances and install certain new equipment at considerable cost. At the hearing before the Commission the Missouri Company, on the theory that the territorial agreement between it and the Service Company precluded any utility other than the Service Company from supplying electrical service in the territory in Clay County west of the agreed division line, took the position that the St. Joseph Company in undertaking to serve this pump station was an interloper and that its application should be denied and the Service Company allowed to serve the station. The Kansas City Company, in view of its territorial agreement with the Service Company, took the same position. It appears pertinent to recall here that the Service Company was the first company approached by the Pipe Line Company and had the first chance at this business; that it was important to the Pipe Line Company that the station be built, equipped and in operation by August 1; that its application to the Service Company for electrical service was held under advisement and considered by the Service Company for approximately six weeks; that the Service Company did not make a definite reply or proposal and terminated the negotiations and in effect abandoned the matter leaving the Pipe Line Company to procure its electrical supply from some other company or install Diesel engines and that apparently neither the Service Company nor the Kansas City Company deemed the business profitable or desirable at a lower schedule of rates than that submitted by them. But it appears that when it was announced that the St. Joseph Company had worked out a satisfactory rate comparable with the cost of Diesel engine operation and had entered into a contract with the Pipe Line to serve this station the Service Company awakened and became interested in the matter and it and the other two companies (the Kansas City Company and the Missouri Company) thereupon joined forces and concluded that the electrical service could be profitably supplied at the rate worked out and agreed upon by the St. Joseph Company. These three protesting companies in the spirit of "one for all and all for one" united in opposition to the granting of the St. Joseph Company's application and put forward the Service Company to do battle with the St. Joseph Company, before the Commission, in an effort to garner unto itself the fruits on the St. Joseph Company's contract. In the ensuing contest the Kansas City Company and the Missouri Company assumed the role of seconds in the Service Company's

corner. They now say in substance that since they have investigated the rates worked out by the St. Joseph Company and the cost of reconstruction and extension of their respective lines they are willing to adopt the rate developed by the St. Joseph Company and they find that either of them can profitably render the service at that rate; in fact that either can do so at less cost and at a greater profit than could the St. Joseph Company. Then as before stated they join in the declaration that the Service Company is entitled to the business because of its so called territorial rights. The Service Company asked the Commission to deny the application and require that electrical power used at the station be purchased from it.

At the hearing before the Commission the Service Company offered to serve the station at the rates offered by the St. Joseph Company *provided* it could make a special arrangement and contract with the Kansas City Company applicable alone to the power used at this station whereby it could purchase such power from the Kansas City Company at a rate which would enable them to sell it to the Pipe Line Company at a profit. The vice president and manager of the Service Company testified that though he learned of the St. Joseph Company rate on May 28, the date of the contract between that company and the Pipe Line Company, he had not done anything about making such special arrangement with the Kansas City Company to meet the St. Joseph Company rate until two days before the hearing when he learned for the first time, and received verbal assurance from officials of the Kansas City Company, that such arrangement could be made but no contract concerning the matter was had. The evidence showed that the existing lines of the Service Company could not carry the load required for the pump station in addition to the electrical current then being carried and distributed by it. The capacity of its Ferrelview substation was only 750 kilowatts; the peak load already required for its customers along that section of its system supplied from its Ferrelview substation was 415 kilowatts and an additional load of 450 kilowatts would be required to serve the station. Its engineer proposed two separate plans both requiring readjustments, reconstruction, extensions and the addition of certain new equipment to enable the Service Company to reach the station and deliver sufficient power to operate it. One plan involved a cost of about $23,000; the other calling for the construction of a new and separate 33,000 volt line the entire distance from Ferrelview to the pump station was estimated at about $25,000. The first plan provided for serving all its other light, heat and power loads from the same circuit used to carry the pump load. This was objectionable to the Pipe Line Company. The Service Company engineer could not specify which plan the company would adopt saying both plans were feasible and it was "just a matter of engineer's choice." The Pipe Line Company's engineer expressed a preference for the definite

plan of service offered by the St. Joseph Company in view of the fact that the Service Company "would have two transpositions of power." As mentioned the Pipe Line Company desired, and the St. Joseph Company had agreed to provide, service over a separate, individual line with no other service off of it. The Service Company left that matter indefinite and uncertain but its engineer stated "we will assure adequate power at a satisfactory voltage." The general attitude of the Missouri Company has been stated as that of positive opposition to granting the St. Joseph Company's application and urging that Pipe Line Company be required if it used electrical power at this station to purchase same from the Service Company but it further says that if, for any reason, it be found that the Service Company cannot supply adequate service then it is in a position to do so by building an extension of its 33,000 volt line at an estimated cost of $13,600. The Kansas City Company's position is similar. Its intervention in the case is to oppose the application of the St. Joseph Company and support the belated claim of the Service Company that it alone is entitled to serve this station. But the Kansas City Company proposes that if the Commission finds that neither the Service Company nor the Missouri Company, to which companies it sells electricity, is in a position to supply adequate service it can do so by building an extension of its lines over a distance of approximately fifteen miles. However, at the hearing the officials of the Kansas City Company seemed to hold to the rates which they had, in the first instance, offered for a like type of service to the pump station at Bonita, Kansas. The evidence showed that St. Joseph Company had ample unused or surplus capacity to fully and adequately meet and serve the requirements of this station; that it was in a position to carry out its contract with the St. Joseph Company and to finance the necessary reconstruction and extension work; that the revenue it would derive annually from this station, under the rates fixed by the contract, would afford a reasonable return upon the investment; that its proposed line would not cross any line of the Service Company or the Missouri Company; that it did not intend, and did not seek permission, to take on any other load or serve or attempt to serve any areas then being served by the Service Company or the Missouri Company and that it sought merely to extend this separate and individual line to serve the pump station only.

The Commission took the view, which the protesting companies advanced, that the issue was between the Service Company and the St. Joseph Company and found that the Service Company had not theretofore "professed a willingness to furnish this class of service at the rates proposed" whereas the St. Joseph Company was "anxious and willing to secure the customer" and "was able, ready and

willing to supply the load and can do so without invading the territory of the Missouri Gas and Electric Service Company in so far as concerns that class of customers it is now serving or those future customers of the same class it may desire to serve and it will not be deprived of any of those rights by granting the application.'' The Commission accordingly made its order granting the St. Joseph Company the authority to serve the station. The hearing before the Commission was concluded July 30, 1932, and the Commission filed its report and entered its order on July 16, 1932. The assignments made in the separate applications for a rehearing filed by the protestants on July 26, 1932, are substantially the same hence the consolidation of the three review cases. In its application for a rehearing the Service Company states that ''*since* the hearing it has reached a *definite* agreement'' with the Kansas City Company and that it is now ''in a position to guarantee service'' to the Pipe Line Company ''upon the same terms quoted that company'' by the St. Joseph Company ''and itself realize a reasonable return on its investment required for the service'' and for the first time since it was approached by the Pipe Line Company in March, 1932, it made a definite and unconditional proposal which is that it ''will furnish service'' to this pumping station ''on the same terms, both as to rate and conditions of service, offered by'' the St. Joseph Company. It is then averred, that the station is ''within the actual territory'' of the Service Company; that it can furnish ''equally good and reliable service'' as the St. Joseph Company; that it is the only company that can ''without loss'' render the required service to this company ''at the rates quoted by'' the St. Joseph Company and that therefore the Commission erred in refusing to assign such service to it and in granting the application of the St. Joseph Company. The application of the Kansas City Company reasserts the territorial claims and says ''its agent'' the Service Company ''is better able to serve this consumer . . . than is the'' St. Joseph Company, ''although the rates'' be the same, ''with a fair return on the total investment.'' The Missouri Company reiterates the territorial claims based on the agreement with the Service Company approved by the order of the Commission in case 7237. Such are the grounds upon which protestants rely in their attack upon the order of the Commission as being ''unlawful and unreasonable.''

Our statute allows a review by the courts of the Commission's order ''for the purpose of having the reasonableness or lawfulness'' of the order ''inquired into or determined'' (Sec. 5234, R. S. 1929) but upon such review the court considers only such objections to the order as are ''specifically'' set forth in the application to the Commission for a rehearing (Sec. 5233, R. S. 1929) and the burden is upon the party seeking to set aside the order of the Commission to show that it is unreasonable or unlawful. [State ex rel. Chicago

Great Western Railroad Co. v. Public Service Commission, 330 Mo. 729, 51 S. W. (2d) 73; State ex rel. City of St. Louis v. Public Service Commission, 329 Mo. 918, 47 S. W. (2d) 102; State ex rel. St. Louis-San Francisco Ry. Co. v. Public Service Commission, 331 Mo. 438, 53 S. W. (2d) 868; State ex rel. Alton Transportation Co. v. Public Service Commission, 330 Mo. 1, 49 S. W. (2d) 614.] The statute empowers the Commission to issue the necessary permit known as a certificate of convenience and necessity, and the determination as to which of the electrical companies shall be permitted to serve the pump station, or from the neglected viewpoint of the consumer, the Pipe Line Company, which of the contesting companies it shall be required to purchase electrical power from for this station, is purely an administrative matter falling within the discretionary power of the Commission. In providing for a review by the courts of these administrative orders the Legislature did not intend that the reviewing court should put itself in the place of the Commission, try the matter anew as an administrative body, weigh the evidence and substitute its finding and judgment on the merits for that of the Commission. Upon review the court is "not concerned with the expediency or wisdom of the order made" and we have no authority to set it aside on our own conception of its wisdom. The sole matter for a court's determination is whether the order complained of is reasonable and lawful and if it appears that the order is "both reasonable and lawful" it must be affirmed; if it be found to be "either unreasonable or unlawful" it must be set aside. [Sec. 5234, R. S. 1929; State ex rel. Detroit-Chicago Motor Bus Company v. Public Service Commission, 324 Mo. 270, 23 S. W. (2d) 115; Public Service Commission v. Kansas City Power & Light Co., 325 Mo. 1217, 31 S. W. (2d) 67; State ex rel. Jenkins v. Brown, 323 Mo. 382, 19 S. W. (2d) 484; State ex rel. City of St. Louis v. Public Service Commission, 329 Mo. 918, 47 S. W. (2d) 102; State ex rel. St. Louis-San Francisco Ry. Co. v. Public Service Commission, supra.] To justify a reversal of an administrative "order of the Commission falling within its discretionary power on the ground that such order is unreasonable, it must appear that the action of the Commission was arbitrary or without reasonable basis." [State ex rel. Alton Transportation Co. v. Public Service Commission, 330 Mo. 1, 49 S. W. (2d) 614.] We held in State ex rel. City of Harrisonville v. Public Service Commission, 291 Mo. 432, 236 S. W. 852, that if the discretionary power vested in the Commission is not "arbitrarily exercised, . . . and if the order made is not violative of the Constitution, or wanting in conformity to statutory authority, and is supported by substantial evidence, we accept it as final." And in State ex rel. Ozark Power and Water Co. v. Public Service Commission, 287 Mo. 522, 229 S. W. 782, we said: "The reasonableness of the order, in the sense in which we may determine it, in the exer-

cise of judicial power, depends on whether it is, or is not, arbitrary, capricious, or unlawful.'' It is not claimed, nor is there any ground therefor, that the order of the Commission is unlawful in the sense that the action of the Commission was beyond its jurisdiction or statutory powers or that no hearing was afforded or notice given but the three protesting companies who took the matter into the circuit court by the statutory writ of review (Sec. 5234, R. S. 1929) rest their joint claim that the order is ''unreasonable and unlawful'' on the ground that in making the order the Commission abused the discretion vested in it and acted arbitrarily and capriciously.

Keeping in mind the limits of a review as prescribed by statute and declared by the decisions we undertake an examination of the objections to the order of the Commission set forth by the protestants in their application for a rehearing. The Commission's brief advances a very logical and well-reasoned contention that neither the Missouri Company nor the Kansas City Company is ''interested'' in the Commission's order within the meaning of Section 5233, Revised Statutes 1929, i. e., that neither is legally interested therein and too there appears to be much force to the further contention that the matter set forth in the applications for a rehearing while proper for the Commission to weigh and consider in determining the question whether the Service Company or the St. Joseph Company should be permitted to serve the pump station falls far short of allegations showing the action of the Commission to be arbitrary, capricious or unlawful but with the view we have of this case we shall pass these contentions, endeavor to take a comprehensive view of the whole situation and examine the objections to the order set forth in the applications for a rehearing with the sole view and purpose of determining as the statute (Sec. 5234, R. S. 1929) provides, ''the reasonableness or lawfulness'' of the order. We shall consider together the claims that the pump station was within both the ''actual'' and ''allotted'' territory of the Service Company; that it was therefore entitled to a monopoly of electrical service in that area and that to allow the St. Joseph Company to extend its line to and serve the pump station would permit it to enter into harmful competition with the Service Company within its own occupied territory and result in duplication of investment and operation contrary to sound and established principles of public utility regulation; wherefore, the protesting companies say, the order of the Commission ''was a gross maladministration of its lawful functions and an unjust and arbitrary abuse of its discretionary powers.''

The order of the Commission in case 7327 approving a voluntary territorial division as between the Service Company and the Missouri Company and designating the territorial division line fixed and agreed upon by the two companies cannot, under the facts in this record, be invoked as a bar against the St. Joseph Company

in view of the stipulation filed by the two contracting companies which in effect exempted the St. Joseph Company from the operation of the agreement and specifically provided that by such agreement it "is not intended to establish" boundary lines between the St. Joseph Company and the contracting companies or either of them. The Commission construed its own order made in that case and its conclusion that the order was intended merely as an approval of a voluntary arrangement or agreement between the Service Company and the Missouri Company and operated only as between the two companies concerned appears reasonable and disposes of the claim of an exclusive territory allotted to the Service Company by order of the Commission.

The site of the pump station is in territory, a little west of the center of an area, which is not reached or served by the transmission lines of any electrical company. We have described, supra, the extent of this unoccupied area and the location and capacity of transmission lines of the St. Joseph Company, the Service Company and the Missouri Company on the north, west and south, and east thereof respectively. The nearest line of any kind to the station site is the Service Company's 2300 volt line to Paradise which is of sufficient capacity only for the local service in the small town of Paradise. This pump station is the only consumer of electricity of that type in all the territory first described south of the east and west line from St. Joseph to Osborn and coming to a point on the south at Kansas City. It constituted a new and distinct type of service. It alone required more electrical power than used over the entire system served by the Service Company from its Ferrelview substation. The existing lines and equipment of neither of the companies operating within a service radius of this station were of sufficient capacity to carry the load required for adequate service. For either of the four electrical companies, who are parties hereto, to meet the requirements of this station it would, as we have pointed out, be necessary for it to first reconstruct existing lines, greatly increasing the capacity thereof, build new and additional lines and install certain new equipment. Thus in a sense this pump station constituted a wholly new and distinct field; a field neither of the contesting companies was in position with its existing lines and facilities, to serve. As we earlier observed in defining the territory immediately involved and the course and location of the various transmission lines therein, as shown by the maps filed as exhibits, the lines of the various companies so closely approach each other at several points and are so located that the site of the pump station at and near the center of the territory might well and reasonably be deemed within the proper service radius of each of said companies. And since the Commission did not find, nor can we say, that the pump station site was within the exclusive territory of the Service

Company and by reason thereof it should have the exclusive privilege, or even the preference, so far as the St. Joseph Company is concerned, all other considerations being equal, of selling the Pipe Line such electricity as it required to operate the station we are not disposed to rule that the Commission, under such circumstances, acted arbitrarily or capriciously and without any reasonable basis. But if it be assumed and granted that because a branch line of the Service Company of comparably small and inconsequential voltage is the nearest electrical line to the site of the pump station and that the Service Company's main transmission lines, though of inadequate capacity, are somewhat nearer in point of distance than the St. Joseph Company's lines that the site of such station should be considered as being in the "actual or natural territory of the Service Company entitling it by reason thereof to preference in opportunity to serve the station we think one factor which apparently, to some extent at least, influenced the conclusion reached by the Commission was properly considered by it. The Service Company was accorded and had the first opportunity to obtain this business. Apparently after the Service Company made an investigation following the Pipe Line Company's application to it for service it concluded that such service was neither practicable or profitable. The Service Company's conditional and indefinite offer as to rates was apparently made after conference with the Kansas City Company upon which it was dependent for, and from which it purchased, all electricity which it distributed. It must have known at the time that the rate would not be acceptable to the Pipe Line Company and was not a rate at which it could operate the station by electrical power at a cost comparable to Diesel engine operation for the identical rate had theretofore been proposed by the Kansas City Company for a like type of service at the Bonita Station and rejected by the Pipe Line Company. Having been accorded the first opportunity to obtain this business and having made the conditional proposal set out in our statement of facts, supra, the Service Company did not thereafter approach, communicate with or resume negotiations with the Pipe Line Company. It did not even advise the Pipe Line Company that it could or would render the required service on the terms and at the rates conditionally proposed in its letter of May 9. In fact it never did make a definite and unconditional proposal until after the hearing when such a proposal was included in its application for a rehearing filed July 26, 1932. A reading of this record leaves the impression that the Service Company abandoned the matter and, as stated, its manager, in effect, testified that so far as the Service Company was concerned the Pipe Line Company was at liberty to use Diesel engines or procure electrical power elsewhere. Can it be that the Kansas City Company and its agent, and in this matter its *alter ego,* the Service Company, proceeded and acted together

on the theory that if the Pipe Line Company used electrical power at this station it must of necessity, and by virtue of what they claimed to be territorial rights, obtain such power only from the Service Company and thus indirectly from the Kansas City Company and that unless the Pipe Line Company purchased such power at the rates fixed by them it could not obtain electrical service. They suggest that if the rate was not fair and equitable the Pipe Line Company could have appealed to the Commission. First, be it remembered no unconditional, definite rate or offer was ever submitted by the Service Company; second, if service had been offered at the rate conditionally proposed it was well known to both the Kansas City Company and the Service Company that such rate was not acceptable to the Pipe Line Company. Therefore in order to establish the so-called power club rate at which it could operate its pump station, comparable with the cost of Diesel engine operation, which was the rate the St. Joseph Company offered and which ultimately and only at the last the Service Company conceded to be a fair rate affording a reasonable and adequate return upon the investment required, the Pipe Line Company would have been required to appeal to the Commission beseeching it to require the Service Company to afford it adequate service and enter into a controversy there as to whether the rate offered by the Service Company was a proper rate for that type of service or whether the power club rate, which it sought, would afford an adequate return to the Service Company upon the investment and service required. Such a proceeding meant delay, possibly and most likely a resort to the courts and indefinite postponement of the project while the Pipe Line Company was committed and obligated to increase the capacity of its line by August 1, and to do so it was necessary that this station be constructed, supplied with the necessary power and in operation by that time. [3] Neither the Commission nor the courts should allow a controversy of this kind among utility companies to obscure the interests and rights of the public or the consumer. In this instance the Pipe Line Company is in the position of the public; it is the consumer; it must pay for the service; it has interests in the controversy which should be considered and kept in mind; and it is entitled to adequate service at a reasonable rate. Neither the Commission nor the courts should protect a utility company in its attempt to reserve a certain area unto itself as its exclusive territory unless the company is willing and able to promptly furnish adequate service to consumers in that territory within a reasonable time and at fair and reasonable rates for the type of service required. The consumer first applied to the Service Company; that company apparently abandoned the negotiations and rejected the business leaving the consumer to either procure electrical service from some other company or install Diesel engines. The consumer applied to the St. Joseph Company; an

agreement was quickly reached for service under the desired conditions as to a direct line and continuous service by August 1, and at the power club rate which was such as enabled the Pipe Line Company to use electrical power instead of Diesel engine power. Under such circumstances we cannot hold that the Commission acted either arbitrarily or capriciously in permitting the ·St. Joseph Company to supply the service. To the writer it would have had more the appearance of arbitrary action if the Commission had denied the application of the St. Joseph Company and required the consumer, if it used electrical power, to purchase it from the Service Company in view of the attitude and conduct of the Service Company throughout. Even during the hearing it would offer no definite or final plan of service or make an unconditional proposal as to rates.

It is contended that to allow the St. Joseph Company to serve this station permits competition with established service in occupied territory and duplication of investment and service in violation of correct principles of regulation. Most of the cases cited, by protestants, in this connection, deal with facts showing an attempt by one utility to enter a field already being adequately served by another company with an established service so that to admit the applicant would result in injurious competition, economic waste and loss and duplication of investment and service. Such is not the situation here but as we have heretofore pointed out this pump station constitutes a new and distinct field of electrical service in that territory. The St. Joseph Company did not seek permission to serve any other consumer or "take on any business" other than service to the pump station. The Commission found that "the applicant (the St. Joseph Company) is able, ready and willing to supply the load and can do so without invading the territory of the Missouri Gas and Electric Service Company in so far as it concerns that class of customers it is now serving or those future customers of the same class it may desire to serve, and it will not be deprived of any of these rights by granting the application." The facts sustain the finding. Each of the protesting companies had established systems for distributing and selling electricity. They existed long prior to the time the Pipe Line Company decided to install this pump station. Service of the pump station by the St. Joseph Company does not and cannot deprive them, or either of them, of any customer they are now serving or might in the future desire to serve. No competition results in the field in which they are established and serving and to which the capacity of their present lines and equipment is adjusted. The case does not involve "destructive competition." To supply the type, quality and satisfactory continuity of service required and insisted upon by the Pipe Line Company it would be necessary, as we have in more detail heretofore stated, for either of the companies to which the service might be allotted,

to reconstruct present lines and build new and additional lines so that electrical power might be delivered to the station over a separate and individual line. The record disclosed the cost thereof to the St. Joseph Company would be about $28,600 and approximately $25,000 to the Service Company. Obviously the extension of a transmission line to the pump station by the St. Joseph Company would not result in the duplication of any existing service or investment.

It is further contended that while the protesting companies, or either of them, and especially the Service Company which is now, with the support and aid of the Kansas City Company and the Missouri Company, contesting with the St. Joseph Company for this business, can serve the pump station at the rates developed by the St. Joseph Company and upon the same conditions of service and earn a reasonable return upon the investment and service required that according to calculations made by protestants, upon data outside the evidence, based upon the value of the plant capacity of the St. Joseph Company required to serve a 450 kilowatt load in addition to the cost of reconstruction and extension of its transmission lines, the St. Joseph Company would be serving the station at a loss which they say would have to be borne by other customers of the St. Joseph Company; hence the rates would be discriminatory. However, the evidence does not warrant such conclusion. The evidence shows that the St. Joseph Company had ample surplus, unused capacity to carry the load and that the load would not take care of all such surplus capacity. The St. Joseph Company's engineer taking into consideration "the line investment" and "value of plant capacity" "plus generating cost of current at the plant" estimated that the pump station business "will still give a return of about 15 per cent on the investment." The manager of the St. Joseph Company testified the company officials considered "it a very provident contract" and that "the revenue is ample to justify the investment." Without undertaking here to review and analyze the computations made it appears that the Commission made an express finding, which is supported by substantial evidence, that the income which the St. Joseph Company would receive would, under the circumstances, justify the additional investment required.

The remaining assignments set out in the applications for rehearing may be reduced to this, that now after the hearing, and for the first time, the Service Company unconditionally proposes and offers to serve the pump station at the same rates and upon the same service conditions proposed by the St. Joseph Company; that it could do so at a larger profit than could the St. Joseph Company; that it can render equally as good service as the St. Joseph Company and that in view of these considerations the Commission acted arbitrarily in permitting the St. Joseph Company to serve the station in preference to it. Taking into consideration the Service Company's

belated proposal and accepting the situation as thus stated by it nevertheless the determination of the question as to which of the companies, the Service Company or the St. Joseph Company, should be permitted, all factors of the situation considered, to serve the station was wholly an administrative matter peculiarly within the discretion of the Commission. Doubtless, under the circumstances, the interest and preference of the consumer was of some weight and even if it were within our province to review and weigh the evidence and pass on the merits we would be inclined to accord much deference to the findings and conclusions of the Commission in view of its information and experience concerning such matters.

The order made by the Commission was supported by substantial evidence and we do not find it to be either unlawful or unreasonable. Therefore the judgment of the circuit court is reversed and the cause remanded with directions to that court to enter judgment affirming the order of the Commission. *Sturgis* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur, except *Atwood, P. J.,* not sitting.